Richmond

## CHARLES S. MONTAGNA, ADMINISTRATOR, ETC.

### v.

## HOLIDAY INNS, INC., ET AL.

August 28, 1980.

Record No. 781358.

Present: All the Justices.

*Calvin W. Breit; John H. Klein (Breit, Rutter & Montagna,* on brief), for appellant.

*John L. Deal; S. Lawrence Dumville (Harvey E. White, Jr.; Edward L. Breeden, III; White, Reynolds, Smith & Winters; Breeden, Howard & MacMillan,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this damage suit seeking recovery for wrongful death, we consider whether the trial court, ruling that a binding compromise and settlement had been effected, correctly sustained a plea of release.

In August of 1977, appellant Charles S. Montagna, Administrator of the Estate of Roger J. Lewis, deceased, the plaintiff below, sued appellees Holiday Inns, Inc. and Norfolk Mid-Town Vacation, Incorporated, defendants below, for the alleged wrongful death of decedent occurring in 1976. Plaintiff claimed defendants were negligent in failing to maintain adequate security at a motel and that such failure resulted in the murder of decedent who was on the motel premises as an invitee. Both defendants joined in a Special Plea of Release, asserted the claim sued upon had been previously settled for $2500.00, moved the court to convene the parties in interest, and sought court approval of the alleged compromise under the applicable statute, then Code § 8-639 (Cum. Supp. 1976), now with slight modification Code § 8.01-55.[1]

---

[1] **§ 8.01-55. Compromise of claim for death by wrongful act.**—The personal representative of the deceased may compromise any claim to damages arising under or by virtue of § 8.01-50, including claims under the provision of a liability insurance policy, before or after action brought, with the approval of the court wherein any such action has been brought, or if none has been brought, with the consent of any circuit court. Such approval may be applied for by the personal representative, on petition to such a court, stating the compromise, the terms thereof, and reasons

Following a December 1977 hearing, the trial court sustained defendants' plea, approved the settlement, entered judgment for plaintiff against defendants for $2500, and ordered defendants released from any further liability arising from the death of Lewis. We awarded plaintiff an appeal from the June 1978 judgment order.

The facts are not in dispute, being gleaned mainly from documentary evidence in the form of letters written among the interested parties. Lewis, an unmarried 32-year-old physician born in England but residing in New York City, died of a gunshot wound to the head sustained during a robbery of his person in a Norfolk Holiday Inn motel room on February 13, 1976. The decedent's sole survivors were his parents, Herbert A. and Aileen M. Lewis, residents of England.

On February 20, 1976, Theodore Bliss, a Norfolk attorney, wrote Burke W. Margulies, another Norfolk lawyer who was an officer of defendant Norfolk Mid-Town Vacation, Inc., stating that Bliss represented the decedent's parents. The letter continued:

"As you know, Dr. Roger J. Lewis was robbed and shot to death by unknown assailants on Friday, February 13, 1976, at approximately 10:00 p.m., while he was a guest at the Holiday Inn Midtown, Virginia Beach Boulevard in Norfolk.

"Dr. Roger J. Lewis was killed and robbed, and I understand that personal property belonging to him of a considerable amount was taken by the robbers. Dr. Lewis's parents, Mr. Herbert Lewis and Mrs. Aileen Lewis, have come from England to claim Dr. Lewis's body and what personal effects are still extant. They are, unfortunately, people in very limited financial circumstances, and find themselves faced with a bill of approximately $1,200.00 for Dr. Roger Lewis's funeral expenses, in addition to approximately $1,000.00 plane fare from England, and approximately $300.00 living expenses while in this country.

"It is surmised that Dr. Lewis had a considerable amount of

therefor, and convening the parties in interest, but it shall not be necessary to convene grandchildren whose living parents are made parties to the proceeding. If the court approve the compromise, and the parties in interest do not agree upon the distribution to be made of what has been or may be received by the personal representative under such compromise, or if any of them are incapable of making a valid agreement, the court shall direct such distribution as a jury might direct under § 8.01-52 as to damages awarded by them. In other respects what is received by the personal representative under the compromise shall be treated as if recovered by him in an action under the section last mentioned.

money upon his person, since this was his usual practice, according to his parents' statements. He always carried sufficient money when he met them on their visits from England to accomodate them in a satisfactory manner. As far as can be ascertained at the present time, his personal effects do not reflect this financial status, and it must be assumed that a considerable amount of money was taken when he was killed in the Holiday Inn Midtown while a guest.

"Mr. and Mrs. Lewis have retained me as their attorney to make claim upon the Holiday Inn Midtown Corporation for the loss of this guest's personal possessions by robbery, due to insufficient security in an area known for crime.

"Mr. and Mrs. Lewis are not claiming compensation for the loss of their son's life, but merely wish to recover the, for them, considerable expense of their necessary journey from England to claim their murdered son's body and for his funeral expenses, plus reasonable living costs while in the country for that purpose.

"I would like to meet with you to discuss the possibilities for a mutually satisfactory settlement of this claim without further legal proceedings, which I am sure both you and I wish to avoid if at all possible."

By letter dated three days later, Margulies denied liability on behalf of "Holiday Inn-Midtown," asserting adequate security had been maintained at the motel and suggesting the decedent voluntarily admitted the "intruders" to the room where the homicide occurred. That letter concluded: "I am, however, forwarding your letter to our insurance carrier inasmuch as there may be some form of coverage, of which I am unaware, which might inure to the benefit of your client." A copy of the letter was sent to William H. Willis, III, a local claims representative of Insurance Company of North America.

On March 24, 1976, approximately one month later, Willis wrote to Bliss acknowledging receipt of the February 20 letter to Margulies and stating:

"I would appreciate it if you would forward us copies of all expenses concerning this claim. At this time, we are making a complete investigation concerning this incident. As soon as we have completed our investigation, we will give you a decision with respect to your claim."

Subsequently, in an undated letter, Bliss wrote Willis, in part, as follows:

"Mr. Lewis realizes that the present unfortunate circumstances make it difficult to make an exact determination of how much money was taken in the robbery-murder and he and his wife feel that their just claims will have been met if their essential expenses in connection with coming from England to dispose of their son's body are replaced.

"Therefore I wish to give you the account of expenses which are:

| | |
|---|---:|
| "Expenses attendant to the funeral and cremation of Dr. Roger Lewis [copy enclosed] | $1142.44 |
| "Air fare from England and a return | 774.00 |
| "Living expenses while in America | 200.00 |
| "Attorney fees | 350.00 |
| Total | $2466.44 |

"These expenses totalling under $2500.00 appear to me to be very reasonable under the circumstances and I can assure you I feel that if Mr. & Mrs. Lewis are recompensed for this amount they will make no further claim against the Holiday Inn Midtown nor any principal nor any servant in connection with this matter."

In a handwritten memorandum to Bliss dated May 3, 1976, Willis acknowledged the recent letter and stated:

"Please be advised that we have investigated this claim and do not feel that our insured is legally liable. However, to bring this claim to an amicable conclusion we would be willing to settle the claim for $2500.00. Please instruct our company how you wish the draft to be made payable."

By letter dated three days later, Bliss wrote to Willis:

"Thank you very much for your letter of May 3, 1976 with reference to your offer of settlement of the above claim by Mr. & Mrs. Herbert Lewis, the parents of Dr. Roger Lewis of New York City.

"On behalf of Mr. & Mrs. Herbert Lewis, as their attorney in this matter, I accept your offer of settlement of $2500.00 in the above claim.

"This sum is accepted in complete satisfaction of any and all present and future claims in this matter that Mr. & Mrs. Herbert Lewis have or may have against the Levinstein Management Corporation, Midtown Holiday Inn, 930 Virginia Beach Boulevard, Norfolk, Virginia, including any present or future claims against the company, its officials, its employees or other representatives or insurers.

"Please make the draft of $2500.00 payable to Theodore Bliss, Attorney, as Mr. and Mrs. Herbert Lewis are in England at the present time."

On May 24, 1976, Bliss again wrote Willis:

"I appreciated your letter of May 3, 1976 pertaining to the offer of $2500.00 in settlement of Mr. & Mrs. Lewis' claim against the Holiday Inn Midtown which offer I promptly accepted on May 6, 1976.

"In my letter, I also stated that on behalf of my client, they would relinquish any future claims connected with this matter.

"To date, I have had no further communication from you and I would like to be informed of the probable date of payment of the $2500.00 in settlement."

Two days later, Willis wrote Bliss:

"This is to thank you for your letter of May 24, 1976 with respect to the above captioned matter. In your letter May 6, 1976, you requested that we make the payment directly to you and that you would see the claim was processed.

"However, we would like to know the Executor of this estate and also provide our company a copy of the Legal Document with respect to the Executor of the estate. Any payment that would be made would be made payable to you and the Executor of Dr. Lewis's estate."

Almost one month thereafter, Bliss acknowledged Willis' last letter stating he understood the decedent's father was the executor of the estate. Bliss stated he would verify that information and provide Willis "with the necessary documents of executorship." In a letter which apparently crossed in the mail with Bliss' last note, Willis again wrote Bliss on June 28 seeking the name of the executor of

the decedent's estate "in order that we can issue the draft and send the necessary release to conclude settlement of this claim."

On August 2, 1976, Bliss wrote Willis:

"In furtherance of the matter of your letter to me on May 26, 1976 concerning our acceptance of $2500.00 in compensation for the above case.

"I apologize for any delay in the grant probate for Dr. Roger Lewis' estate. I had to correspond with Mr. & Mrs. Herbert Lewis and his attorney in England and I am enclosing a copy of the letter I have just received from the attorney. It appears to be self explanatory.

"As soon as I receive the documents granting probate to a specified Executor I will forward them to you and will also obtain an affidavit from Mr. & Mrs. Herbert Lewis that the payment of $2500.00 is in full settlement of any past or future claims against your client or his employees."

Bliss enclosed a copy of a letter to him from Alan Roper, the parents' attorney in England. The solicitor indicated he would send a copy of the grant of probate "in the fairly near future" and wrote, "I would be much obliged if you would confirm to me that the Insurers are abreast of the situation and that their offer will not be withdrawn in the light of unavoidable delay."

On September 20, 1976, Bliss again wrote Willis enclosing a copy of a September 13 letter from Roper. Roper, noting a complication had arisen causing a further delay in the qualification of a personal representative of the decedent's estate, inquired whether a grant of probate was "strictly necessary" to consummate the settlement. He pointed out that "the moneys are being paid to Mr and Mrs Lewis not as Executors but in their own personal capacity." He wrote he would forward a "Statutory Declaration" executed by the parents reciting that the sum of $2500 "is accepted in full and final settlement of any claims" against the defendants arising out of the death of Lewis. In his letter to Willis, Bliss stated:

"the $2,500 is being paid to Mr. & Mrs. Lewis personally for the expenses which they underwent as a result of Dr. Roger Lewis's murder at the Holiday Inn Motel.

"Under these circumstances, I feel that it would simplify this matter considerably if your company would pay their claim as per the offer from your company that we have accepted.

"You will note that both Mr. Roper and I intend to obtain a release from Mr. & Mrs. Lewis of all any [sic] every further claim against your company or their agents or employees in the death of Dr. Roger Lewis for the payment of $2,500.

"I would be much obliged if you could expedite the payment of the money so that the case can be closed."

On September 30, 1976, Bliss wrote Willis:

"I am herewith enclosing a Statutory Declaration of release of all claims by Mr. & Mrs. Herbert Lewis against your company, the Holiday Inn Midtown, Levinstein Management Corporation, their agents and employees, for the expenses incurred by reason of the murder of their son, Dr. Roger J. Lewis in the Holiday Inn Motel, in return for your offer of payment of $2500.00 which they have accepted.

"As this matter has been pending for some time and as the sum involved is comparatively small, I would be much obliged if your [sic] would forward me the check for $2500.00 so this matter can be closed."

The "Statutory Declaration" executed by both parents recited in part:

"As a result of the death of our son we incurred certain expenses and we hereby acknowledge that the sum of $2,500, when paid, will be accepted by us in full and final satisfaction of any claims we may have against the [defendants] arising out of the death of our son."

One month later, on November 1, 1976, James T. Baker, another Norfolk attorney, wrote Willis stating he had been retained as "co-counsel" with Bliss. Baker wrote that

"the previous offer of settlement is hereby rejected immediately and we are requesting the return of the release form that was previously properly executed and forwarded to you regarding this matter. Kindly be on notice that you have not complied

with the settlement agreement and that the draft has not been issued to the proper recipients and will not be accepted at this time."

The present suit was filed approximately ten months later.

At the hearing, Willis, a non-lawyer, testified his purpose in seeking the name of the personal representative of the estate was to try to procure a properly executed release and "get the legal mechanics of the claim processed so the draft could be issued." Willis agreed during his testimony that he was "not prepared to make a payment of $2,500 or any amount" unless an executor qualified on the estate. Willis said: "It was also my feeling that, of course, we had to obtain some type of court-approved settlement on it. And he [Bliss] being the attorney, it was my assumption that he would take care of this for us." But Willis confirmed during his testimony that in his communication with Bliss he never stated, either orally or in writing, that payment of the funds was conditioned on court approval of the compromise.

Bliss testified that he never considered it necessary to have the settlement approved by a court and that he could not "fathom" why payment of the funds was delayed. Noting the small sum involved and the fact the parents were in England, Bliss said it would have been "unrealistic" to require them to come to this country merely to appear in court in connection with the compromise. Bliss stated that his purpose in seeking to obtain qualification upon the decedent's estate and the release was merely to accommodate Willis. Bliss pointed out he repeatedly asked Willis to pay the money directly to him as the attorney for the parents so he could properly distribute the funds.

The evidence showed that subsequent to Willis' receipt of the release with the September 30 letter, there was no further communication between Willis and Bliss on the matter, although Willis said he tried unsuccessfully to reach Bliss by telephone on "numerous occasions." Willis, "feeling that we probably would need a court-approved settlement," said he did not seek advice of the insurer's local attorney or take any other steps to close the transaction, even after receipt of Baker's November 1 letter.

At the trial level, the respective parties agreed that in Virginia sole adult beneficiaries under a claim for wrongful death may properly enter into a valid agreement to settle the claim prior to the appointment of a personal representative. In a letter opinion, the court below found from an analysis of the evidence, mainly the correspondence,

that the beneficiaries on one hand and the insurer on the other reached a binding agreement and that a settlement contract arose when the insurer's offer of May 3 was accepted by the beneficiaries' response of May 6. The trial court reasoned that the ensuing delay and the later communications between the parties dealt merely with "the mechanics of performance of the agreement" and did not amount to the exchange of offer and counteroffer, as plaintiff contended. The court said that "the agreement was reaffirmed by the beneficiaries several times and ultimately as late as September 30, 1976" when the release was transmitted to the insurer. Accordingly, the trial judge decided that the beneficiaries repudiated the settlement contract prematurely without allowing the insurer a reasonable time to consummate the agreement.

On appeal, defendants argue, adopting the trial court's rationale, that a valid compromise agreement was reached between the parties to settle the potential claim which the beneficiaries of the Lewis estate were asserting against them.[2]

Responding to plaintiff's argument that only an executory accord, or an accord without satisfaction, was created, defendants urge that a "compromise and settlement" should be distinguished from an "accord and satisfaction." They say an accord is "an agreement to settle any claim, whether it is disputed or undisputed." They argue that, on the other hand, a compromise is "an agreement to settle only a disputed or unliquidated claim." They urge the rule to be followed here, and one which gives force to the distinction between these concepts, is that although performance is necessary to a complete accord and satisfaction, it is not essential to a valid compromise. The contract was supported by valuable consideration, they say, because there existed mutual promises of the parties, that is, in return for a promise by defendants to pay a sum of money the beneficiaries promised to forbear litigation of their potential claim.

Defendants argue the actual agreement was struck in May of 1976 and that the later events merely dealt with the mechanics of performing both promises. They opine that a written release was required to confirm the beneficiaries' promise to forbear litigation and the name of the executor was needed "so that a valid payment could

---

[2] We will assume, without deciding, that, as the parties agree on appeal, a binding settlement of a wrongful death claim may be effected by a decedent's sole adult beneficiaries prior to appointment of a personal representative. *But cf. Caputo* v. *Holt,* 217 Va. 302, 228 S.E.2d 134 (1976) (after appointment of a personal representative, court approval is required to accomplish a binding compromise of such a claim).

be made." They say when the release was finally mailed on September 30, the "question as to a local executor was still unanswered."

Defendants also contend the release was a valid contract, binding upon the beneficiaries, because it was executed without fraud or duress and with a full understanding of its consequences and effect. Defendants argue they had no duty to perform their promise to pay prior to September 30 when the executed release was tendered, and that a reasonable time had not elapsed before the November 1 premature repudiation by Baker. They say it was necessary after September 30 to convene the parties, obtain final court approval, and pay the money. They disavow taking the position there was no valid contract until the settlement had been approved by a court. Rather they assert a valid compromise was in effect with the "only matter remaining [being] a determination by the court of proper distribution" of the fund.

Hence, defendants conclude, because the parents were the sole beneficiaries and have properly released defendants, the administrator can no longer assert the death claim on their behalf. We disagree.

■ The essential elements of a valid contract must exist to support a binding compromise settlement; there must be a complete agreement which requires acceptance of an offer, *Bangor-Punta Operations, Inc.* v. *Atlantic Leasing, Ltd.,* 215 Va. 180, 183, 207 S.E.2d 858, 860 (1974), as well as valuable consideration. And, contrary to defendants' argument, it is unnecessary to dwell here on any narrow distinction which may exist between a "compromise" or "settlement" on one hand and "accord and satisfaction" on the other. The issue is always ultimately resolved by a "determination of the intention of the parties, as objectively manifested." *Goldbard* v. *Empire State Mutual Life Insurance Co.,* 5 App. Div.2d 230, 234, 171 N.Y.S.2d 194, 199 (1958).

■ The problem presented in cases of this kind is whether negotiations upon a disputed claim have culminated in an agreement so final that no action may be brought on the antecedent claim, but only upon the later agreement. The legal writing on the subject is legion. *See, e.g.,* Restatement of Contracts §§ 417-19; 6 A. Corbin, Contracts §§ 1268-92 (1962); 15 S. Williston, Contracts §§ 1838-48 (3d ed. 1972); Annot., 94 A.L.R.2d 504. In those cases where a valid settlement contract has been formed, the agreement may take the form of either an executory accord or a substituted contract.[3]

---

[3] An executory accord is "an agreement that an existing claim shall be discharged in the future by the rendition of a substituted performance." Corbin at 75. The actual

But if there has been no meeting of the minds during the course of the negotiations sufficient to create a valid contract, it is unnecessary to examine the technical form of the purported agreement. This is such a case.

Here, the parties never reached a mutual agreement on every essential element of the proposed settlement. Specifically, the record demonstrates as a matter of law that the insurer intended to condition payment of the agreed sum upon appointment of a Virginia personal representative and subsequent court approval of the contemplated compromise. The beneficiaries not only did not agree to this condition, they were never advised of it.

As the negotiations began, Bliss made the February 20 demand emphasizing that his clients were "not claiming compensation for the loss of their son's life" but only for their personal expenses incurred for traveling from England to claim the body, for funeral expenses, and for living costs while in this country. In response to the insurer's request for a list of expenses "concerning this claim," Bliss itemized the claim, again emphasizing that the beneficiaries' "just claims will have been met if their essential expenses in connection with coming from England to dispose of their son's body are replaced." Manifestly to this point in the discussions, the parents never contemplated dealing with reference to any claim of their son's estate which required court approval, only their personal losses.[4]

Then, Willis offered to settle "the claim" for $2500. Bliss accepted that offer in his May 6 letter again pointing out that the "sum is accepted in complete satisfaction of any and all present and future claims in this matter that [not the estate but] Mr. & Mrs. Herbert Lewis have or may have" against the defendants and their insurers. Bliss requested the settlement check be made payable to him as attorney for his individual clients.

---

performance of the promise, not the promise to render such performance, discharges the original obligation. Thus, such an agreement does not operate as an immediate extinguishment of the antecedent claim. *See* Sheperd, *The Executory Accord,* 26 Ill. L. Rev. 22 (1931). If, on the other hand, the compromise agreement provides for an immediate discharge of the original claim, it is a substituted contract. Corbin at 74. When the compromise agreement is not fully performed, it becomes significant whether the agreement is an executory accord or a substituted contract because the remedies for a breach of the former may differ from the remedies for breach of the latter. 94 A.L.R.2d at 509. *See* Gold, *Executory Accords,* 21 B.U. L. Rev. 465 (1941).

[4] Because we decide that at the threshold there was no mutual assent, we need not consider the substance of the purported agreement and whether the beneficiaries could properly claim recovery for their individual expenses. *See* Code § 8.01-52, specifying the items of damage in a wrongful death claim.

Next, Willis injected a new element into the negotiations when on May 26 he asked for the name of the executor of the estate as well as "the Legal Document" concerning the estate, stating that payment would be made jointly to Bliss and the executor. For the next four months, Bliss and his correspondent in England undertook to comply with Willis' request in order to conclude the compromise.

But the evidence shows that all the while the insurer had no intention of paying the $2500, or any other sum, unless a local personal representative qualified on the estate and a court subsequently approved the compromise. This is manifest from Willis' clear, uncontradicted testimony. Consequently, throughout the negotiations the beneficiaries intended to settle merely their so-called "personal claim" directly with the insurer without court intervention while at the same time the insurer did not intend to compromise any claims arising from the death unless court approval was obtained.[5]

Accordingly, we believe the negotiations after May and up to the November repudiation did not merely relate to the mechanics of fulfilling a binding agreement, as defendants contend, but rather constituted an effort by the insurer to impose an undisclosed condition upon the settlement as a whole to which the beneficiaries had not consented. Under those circumstances, the beneficiaries had a right to renounce the purported compromise and then to prosecute the original claim, the release being invalid for failure of consideration.

For these reasons, we hold the trial court erred in sustaining the plea of release. The judgment below will therefore be set aside and the case remanded for a trial upon the merits.

*Reversed and remanded.*

---

[5] Indeed, it is probable that during the entire negotiations the insurer intended to settle all claims arising from the death, not just any "personal" claim of the beneficiaries.