Kathleen M. Mizzi TODD, Plaintiff,

v.

**BLUE RIDGE LEGAL SERVICES, INC., and John E. Whitfield, individually, and in his official capacity as Executive Director of Blue Ridge Legal Services, Inc., Defendants.**

No. Civ. A. 5:01CV00021.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Dec. 12, 2001.

Kathleen M. Todd, Harrisonburg, VA, for plaintiff.

Melvin Bruce Wallinger, Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, for defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Before the court is the defendants' motion for summary judgment, filed September 6, 2001. This matter was referred to United States Magistrate Judge B. Waugh Crigler for proposed findings of fact, conclusions of law, and a recommended disposition. See 28 U.S.C. §§ 636(b)(1)(B). On October 29, 2001, the Magistrate Judge issued his Report and Recommendation, wherein he recommended that the court grant the defendant's summary judgment motion. The plaintiff filed timely objections. The defendants filed a response. The court has reviewed *de novo* those portions of the Report and Recommendation as to which objections were made. See 28 U.S.C. § 636(b)(1) (West 1993 & Supp. 2000); Fed.R.Civ.P. 72(b). The court shall adopt the recommendation of the Magistrate Judge to grant the defendants' summary judgment motion.

### I.

The following facts are undisputed, unless otherwise noted. The plaintiff, Kathleen M. Mizzi Todd, was employed by the defendant, Blue Ridge Legal Services, Inc., a not-for-profit corporation that provides *pro bono* legal services, from October, 1987 until February, 1999. James Whitfield, also a defendant, is executive director of Blue Ridge Legal Services, Inc.

The defendants hired the plaintiff with the expectation that she would devote sixty percent of her time to the duties of a *pro bono* referral coordinator and forty percent of her time to the tasks of a staff attorney. The plaintiff contends that this split in duties was in name only. According to plaintiff, she not only performed *pro bono* related duties but also carried the same caseload as full-time staff attorneys. In June, 1989, the plaintiff officially became a full-time staff attorney for Blue Ridge Legal Services.

In late 1998, the defendant, John Whitfield, maintains that he learned the plaintiff had engaged in the unauthorized outside practice of law. He states that he met with the plaintiff on December 28, 1998, to determine the nature and extent of this outside practice. The plaintiff represents that she had been offering legal assistance to an eligible, former client of the organization and that such work was routinely permitted by defendants. The defendants claim that the plaintiff failed to provide written disclosure of details of this work. The plaintiff, meanwhile, maintains that she did comply in providing an oral explanation about the case on which she was working.

The defendants also discuss a subsequent conversation with the plaintiff on January 21, 1999 where the plaintiff is alleged to have misled Whitfield about the extent of her outside law practice and concealed the fact that she had continued it since their December conversation. The plaintiff does not mention this conversation in her briefs and says only that the defendant refused to schedule an informal grievance meeting in January.

On February 2, 1999, defendant Whitfield arranged to meet with the plaintiff on February 5, 1999 to discuss personnel issues. The plaintiff filed a formal grievance against Whitfield on February 4, 1999. At the February 5, 1999 meeting,

Whitfield informed the plaintiff that she was terminated immediately for serious misconduct and presented her with a written statement of explanation. The parties agree that the meeting commenced in the morning, was interrupted around midday to permit the plaintiff to take her child to a doctor, and resumed later in the afternoon upon her return. Defendant Whitfield maintains that lengthy negotiations took place during their meetings and that the termination agreement was drawn up to reflect them. The plaintiff counters that no negotiation took place and that the defendant threatened her with the loss of her accrued annual leave and her last paycheck if she did not sign the agreement immediately. The plaintiff also accuses the defendant of threatening that unless she signed the termination agreement, she would be escorted off the premises immediately and not allowed to assist in a smooth transfer of her cases. According to the defendant, it was the plaintiff who contentiously threatened not to cooperate in turning over her cases if she was fired.

The one page termination agreement, signed on February 5, 1999, included, among other provisions, one which states that the termination was consensual and another which states that the plaintiff withdrew her grievance with prejudice. Under the agreement, the plaintiff's date of termination was stated as March 7, 1999 with a stipulation that this date was agreed upon specifically to allow the plaintiff to utilize or cash in all her accrued annual leave. The agreement also contains a waiver of all claims arising from her employment with an exception for claims concerning unemployment benefits and accrued annual leave.

On February 11, 1999, the plaintiff sought to revoke the termination agreement and reinstate her grievance. She submitted a signed statement to this ef-

fect to defendant Whitfield and resubmitted her grievances against Whitfield. The Blue Ridge Grievance Panel took up these grievances on April 27, 1999. The panel found that no credible evidence of gender bias or hostility existed, that the plaintiff knowingly and voluntarily signed the agreement absent duress, and that defendant Whitfield had cause to terminate the plaintiff's employment. On March 6, 2001, the plaintiff filed this suit in which she claims that the defendants violated the Equal Pay Act, 29 U.S.C. § 206(d). Specifically, the plaintiff claims that defendants paid her a lesser amount than similarly situated male employees. The plaintiff seeks compensatory and punitive damages as well as attorney's fees and costs. The defendants first filed a motion for summary judgment on April 30, 2001. On August 17, 2001, this court denied that motion without prejudice to refile at the conclusion of the discovery period.

The defendants again filed a motion for summary judgment on September 6, 2001. They claim that the plaintiff's claims are barred by the statute of limitations; that the plaintiff waived her right to bring this action by signing the termination agreement; that the plaintiff cannot prove a *prima facie* case for violation of the Equal Pay Act; and that even if the plaintiff can show the existence of a salary differential, the defendants can provide an explanation which comes under the exemptions contained in the Equal Pay Act.

## II.

A party is entitled to summary judgment when the pleadings and discovery show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.2000) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). If the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party, then there are genuine issues of material fact. *See* 477 U.S. at 248, 106 S.Ct. 2505. All facts and inferences shall be drawn in the light most favorable to the non-moving party. *See Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 227 (4th Cir. 2000).

## III.

As discussed above, the defendants moved for summary judgment on several grounds.[1] The Magistrate Judge recommended granting their motion on the grounds of waiver, or alternatively, on the merits of the claim. The plaintiff objected to both these recommendations.[2] The

---

1. The Magistrate Judge recommended denial of the defendants' summary judgment motion on the grounds of statute of limitations. The defendants do not object to this recommendation, but disagree with a statement by the Magistrate Judge concerning the period for which the plaintiff is eligible to seek damages. The court, upon review of the record and no objection having been filed, adopts the Magistrate Judge conclusion that the statute of limitations had not run before the plaintiff filed her claim. It is unnecessary to reach the issue of the eligibility time period for damages as the court shall grant the summary judgment motion on other grounds.

2. In their response to the plaintiff's objections, the defendants move to strike the plaintiff's objections for being conclusory allegations rather than the "specific, written objections" required by Fed.R.Civ.P. 72(b). The court finds that plaintiff's objections are sufficient to comply with the requirements of Rule 72(b) and thus, the motion is denied.

court shall first address the issue of waiver.

The waiver, at issue in this case, is located in paragraph 4 of the termination agreement and reads, as follows:

4. By agreeing to the termination of employment, Ms. Todd hereby waives and releases Blue Ridge Legal Services, Inc., from any and all claims arising from her employment and her termination of employment, other than any claim she might have for unemployment compensation benefits and accrued annual leave, and she agrees not to challenge her termination of employment in any forum whatsoever (except as necessary to pursue a claim for unemployment compensation benefits throught [sic] the VEC appeals process), whether administrative or judicial, including but not necessarily limited to the BRLS grievance procedures, the BRLS Board of Directors, any state or federal government agency, and state or federal courts.

 Federal courts must assess whether a waiver of a federal statutory claim is made knowingly and voluntarily. *See, e.g., Wagner v. NutraSweet Co.,* 95 F.3d 527, 533 (7th Cir.1996) *and District 29, United Mine Workers of America v. New River Co.,* 842 F.2d 734, 737 (4th Cir.1988). While acknowledging that some circuits have conducted this assessment under a totality of the circumstances test,[3] the Fourth Circuit applied ordinary contract principles to assess the validity of a waiver of age discrimination claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq. O'Shea v. Commercial Credit Corp.,* 930 F.2d 358 (4th Cir.1991), *superceded by statute,* 29 U.S.C. § 626(f) (1990 amendment). The *O'Shea* case was superseded by statute when Congress amended the ADEA to provide for a totality of the circumstances test. However, as the Equal Pay Act is silent as to the standard a court should use in assessing the validity of a waiver, this court finds no reason to deviate from the approach adopted in that case. Accordingly, the court shall apply ordinary contract principles to evaluate the validity of the termination agreement at issue. The court shall rely on Virginia law, as the state where termination agreement was signed.

## A.

 Under Virginia law, a termination agreement must meet the same requirements as a contract in order to be valid. *See Montagna v. Holiday Inns,* 221 Va. 336, 347, 269 S.E.2d 838, 844–45 (1980) (holding that a settlement agreement must contain the same essential elements as a contract); *see also Gunn v. Richmond Community Hosp., Inc.,* 235 Va. 282, 286, 367 S.E.2d 480, 482 (1988). The burden falls first on the defendants to prove the initial validity of the agreement. *See Freedlander, Inc. v. NCNB National Bank of North Carolina,* 706 F.Supp. 1211, 1215 (E.D.Va.1988), *aff'd,* 921 F.2d 272, 1990 WL 209860 (1990). The defendants must show that a dispute existed between the parties, that the parties signed the agreement to settle the dispute and that some consideration was present. *See id.*

No question exists in this case that the parties were in a dispute. The plaintiff

---

3. Using this approach, courts consider criteria such as: (1) the clarity and lack of ambiguity in the agreement; (2) plaintiff's education and business experience; (3) whether a non-coercive atmosphere surrounded execution of the agreement; (4) whether the employee had the benefit of legal counsel. *See e.g. Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 462 (9th Cir.1989), *cert. denied,* 498 U.S. 854, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990).

found herself presented with a termination notice on February 5, 1999. It is also clear that the termination agreement sets out the framework under which the plaintiff was to depart from Blue Ridge Legal Services. According to the defendants, several provisions of the agreement constitute the necessary consideration. Namely, the parties agreed that the termination would be deemed the result of mutual agreement. In addition, the agreement specifically takes into account the desire by plaintiff to use all her accrued annual leave. Thus, the agreement provides that the plaintiff's official last day would be March 7, 1999, although her actual last day in the office would be February 15, 1999. The plaintiff would be on leave in the interim.

The plaintiff argues that no consideration was given for her waiver as she already had a right to everything contained in the termination agreement. The plaintiff does not contest the defendants' assertion that she had accumulated 240 hours of leave. The defendants' policy was to allow an employee to cash in 160 hours. The court finds that, at a minimum, the fact that the agreement allowed the plaintiff to utilize the remaining 80 hours of leave constitutes something to which the plaintiff, as the party signing the waiver, did not have an absolute right. In Virginia, consideration has been defined as:

> [T]he price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made. It matters not to what extent the promisor is benefitted or how little the promisee may give for the promise. A very slight advantage to the one party or a trifling inconvenience to the other is generally held sufficient to support the promise.
>
> *Brewer v. First Nat. Bank of Danville,* 202 Va. 807, 815, 120 S.E.2d 273, 279 (1961).

Certainly, the ability to use all her accrued leave is a benefit to the plaintiff as is a stipulation that the her departure was by mutual consent and not for serious misconduct. Likewise, the plaintiff's withdrawal of the formal grievance and waiver of future claims benefitted the defendants. Therefore, the court is satisfied that the agreement was made with consideration.

**B.**

As the defendant met its burden of demonstrating the initial validity of the agreement, the burden shifts to the plaintiff to show through clear and convincing evidence that the agreement is not valid. *See Cary v. Harris,* 120 Va. 252, 91 S.E. 166, 167, (1917) *and Freedlander,* 706 F.Supp. at 1215. Here, the plaintiff argues that because she signed the agreement under duress, the waiver is not valid. Under Virginia law, duress exists "when a defendant commits a wrongful act sufficient to prevent a plaintiff from exercising his free will, thereby coercing the plaintiff's consent." *Goode v. Burke Town Plaza, Inc.,* 246 Va. 407, 411, 436 S.E.2d 450, 452 (1993). "Duress is not readily accepted as an excuse." *Seward v. American Hardware Co.,* 161 Va. 610, 639, 171 S.E. 650, 662 (1933).

Virginia courts have recognized the existence of three standards for dealing with duress but have never formally adopted one: (1) the ancient doctrine calls for a threat sufficient to deprive a constant and courageous man of his free will; (2) the modified doctrine calls for a threat sufficient to overcome the will of a man of ordinary firmness or courage; and (3) a modern version calls for a determination of whether the threat actually overcame the will of the person threatened. *See Ford v. Engleman,* 118 Va. 89, 95, 86 S.E. 852, 855 (1915) (inclining to the modified rule but noting that it was unnecessary to decide in that case) *and Ellis v. Peoples National*

*Bank of Manassas,* 166 Va. 389, 393 186 S.E. 9, 11 (1936).

The plaintiff advocates use of the modern doctrine, that is, an inquiry into whether her will was actually overcome by the threats of the defendant. While an argument could be made that Virginia courts would more likely use the modified approach, the court shall give the benefit of all favorable legal theories to the plaintiff, as the non-movant. *See Freedlander,* 706 F.Supp. at 1216. The court shall analyze the plaintiff's claim of duress to determine whether her will was actually overcome by the defendants' threats.

■ However, even if the modern doctrine is applied, the plaintiff must produce more than just a statement that her will was overcome. The court shall conduct a fact intensive inquiry to determine if the plaintiff's claim is sufficiently supported by objective evidence in order to reach a jury. *Id.* The court may consider the surrounding circumstances such as age, capacity, and the situation and relation of the parties. *See Jacobs v. Jacobs,* 218 Va. 264, 237 S.E.2d 124 (1977) *and Cary v. Harris,* 120 Va. 252, 91 S.E. 166, 168 (1917) (analyzing duress by considering the character of the transaction and the relation of the parties); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 175 cmt. c (1981).

In construing the facts in a manner most favorable to the plaintiff, the court shall accept, for the purposes of this inquiry, the plaintiff's representations that she was threatened with loss of her salary and all of her accrued annual leave if she did not sign the agreement. Thus, the court shall assume that the defendants' acts were wrongful. Furthermore, the court shall accept the plaintiff's statement that her will was overcome. The court must now determine whether the plaintiff's statement is supported by the surrounding circumstances.

The plaintiff states that she was given no time to reflect upon the agreement, that she had no time to consult legal counsel, and that she was ignorant of possible legal alternatives. The court recognizes that the plaintiff is attempting to fit her case into the paradigm created by the *Freedlander* court. *See* 706 F.Supp. at 1221 (denying a duress claim based on an analysis of the party's opportunity to reflect, to speak with counsel and to pursue other legal remedies). The court, however, is not persuaded that the plaintiff has succeeded.

The plaintiff paints a picture of walking into an ambush where she had only seconds to make a life-altering decision. The record reflects that the meeting between the plaintiff and defendant Whitfield began in the morning, broke in the early afternoon and resumed later in the day. The parties were therefore together for some hours. Moreover, the plaintiff knew that she was under investigation for violating the defendants' employment policies. The defendant scheduled the meeting on February 2, 1999. The plaintiff admits that after scheduling the meeting with defendant, she felt it in her best interest to file her formal grievance against the defendant and did so on February 4, 1999. The sense of urgency which the plaintiff wishes to convey is belied by the fact that she had some inkling of what she was walking into and by the fact that the February 5, 1999 meeting stretched over the entire day.

■ Furthermore, the coercive threat at issue "must leave the aggrieved party without any reasonable alternative other than to assent to the contract." *King v. Donnkenny, Inc.,* 84 F.Supp.2d 736, 738 (W.D.Va.2000) (finding that breach of contract or restitution may be alternatives where employer threatens to withhold back wages or severance pay). The plaintiff represents that she had no counsel

present to tell her possible alternatives, and as such that her will was overcome.

The court acknowledges that the plaintiff did not consult counsel during the meeting, but finds that this is not fatal to the validity of the agreement. According to the duress standard favored by the plaintiff, the question before the court is not whether the threat could overcome the will of an ordinary person; rather it is whether the threat actually overcame the will of the plaintiff. In answering that question, the court cannot ignore the fact that the plaintiff is an attorney with more than ten years of experience who, according to the report of the Grievance Board, admitted to having done some case work on employment law issues.

The plaintiff has objected that no lawyer can be expected to know all the laws in all areas of practice. The court does not disagree with this. However, the issue here is whether one lawyer with more than ten years of experience, who believed she was being wrongfully discharged, felt she had no legal remedy and thus had her free will overcome by the defendants' threats to withhold her last paycheck and her annual leave benefits. The court finds it incredulous that the plaintiff's answer is yes. The court would hope than even a first year attorney could identify a couple of legal remedies to which the plaintiff could have recourse if the facts were as she portrayed them. Furthermore, the plaintiff's contention that she felt trapped by the circumstances is undermined by the termination agreement itself, which in all appearances was a bargained for contract.

■ The plaintiff also points out that she repudiated the termination agreement six days after signing it. Prompt repudiation of an agreement is a factor to be taken into consideration in a duress analysis. *See Freedlander*, 706 F.Supp. at 1221. However, the factor receives much less weight where, as here, the record indicates

that the plaintiff still enjoyed the benefits of the agreement even after her repudiation as she used or cashed in all her annual leave. *See id.*

The court does not doubt that the plaintiff found herself in a bad situation. The plaintiff was being fired. However, the facts show that out of this bad situation emerged an agreement that allowed the plaintiff to take the benefit of more accrued annual leave than she was entitled to under the defendants' employment policies. Under the agreement, this termination for serious misconduct as alleged by the defendant, became a consensual termination. Furthermore, the meeting which produced this agreement lasted for some time over one day. The court cannot discount that the plaintiff is an experienced attorney who was aware that she had been under investigation by defendants for allegedly violating personnel polices. These facts, taken together with the law in Virginia where compromises are favored agreements, while duress is not a favored excuse, lead to the conclusion that the plaintiff has not put forth sufficient evidence of duress to reach a jury. The termination agreement is therefore valid as is the waiver contained in it. As such, the plaintiff's EPA claim is waived.

However, even were the court to find that the waiver was invalid, the court does not believe that the plaintiff's Equal Pay Act claim survives the defendants' summary judgment motion.

## IV.

The Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the

rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . . 29 U.S.C. § 206(d)(1).

■■■■ The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Strag v. Board of Trustees*, 55 F.3d 943, 948 (4th Cir.1995). In this case, the plaintiff must show: (1) the defendants paid her less than a male co-employee; (2) that the said employees performed work requiring equal skill, effort and responsibility; and (3) that they performed this work under similar working conditions. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir.1999) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). The plaintiff must identify a particular male "comparator" for purposes of this inquiry. *Strag*, 55 F.3d at 948.

■■■■ If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendants to prove by a preponderance of the evidence that the wage differential resulted from one of the four statutory exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1); *see also Brinkley*, 180 F.3d at 613–14. If the defendant provides a satisfactory explanation for the pay differential, the burden shifts again to the plaintiff to produce "specific evidentiary materials that demonstrate the existence of a 'genuine issue for trial.'" *Id.* at 615 (quoting *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987)).

## A.

■■■■ Rather than pointing to one male comparator in her brief, the plaintiff draws numerous comparisons between herself and several of the male employees with regard to both starting salary and eventual salary increases. The plaintiff was hired in October 1987 to a position that required work as both a staff attorney and *pro bono* referral coordinator at a salary of $15.000.00. The plaintiff had no previous experience as a practicing attorney. Both parties state, in their summary judgment filings, that the plaintiff was expected to spend sixty percent of her time on her duties as *pro bono* referral coordinator and forty percent on staff attorney responsibilities.[4] In June 1989, the plaintiff was promoted to the position of full-time staff attorney at a salary of $17,250.00.

The parties dispute whether that initial estimate of how much time the plaintiff should spend on her respective duties was ever in fact realized. The plaintiff asserts that she carried a full case load in addition to performing her *pro bono* related duties, such that she should have been credited with one and a half years of experience in

---

4. In one part of their summary judgment memorandum, the defendants state that the plaintiff's duties were to be split sixty percent/forty percent (Def.'s Mem. Summ. J. at 3), while in a chart within the memorandum, (Def.'s Mem. Summ. J. at 4), the defendants state that plaintiff devoted one-third of her time to working as a staff attorney. The court shall rely on the allocation most favorable to the plaintiff, as the non-movant, and thus accept that the initial expected split was 60 percent of time on *pro bono* issues and 40 percent of time on staff attorney duties.

June 1989, instead of the one-half year with which the defendants credit her.

The court does not consider this debate critical to its inquiry. It is relevant with regard to only one of the plaintiff's comparators, Richard Faulds, who was hired in October 1986 as a staff attorney at a starting salary of $17,000.00. The plaintiff compares his starting salary to her starting salary of $15,000.00 when she was hired one year later. However, the plaintiff's reliance on this comparator for a *prima facie* case of discrimination fails since by the plaintiff's admission, she was hired to a split *pro bono* coordinator/staff attorney position. The plaintiff and Faulds were hired to fill different positions with different responsibilities. *See Strag.* 55 F.3d at 948. That some overlap existed in their responsibilities cannot negate the fact that the plaintiff and Faulds held different positions; as such, the court finds that Faulds is not a proper comparator.

The plaintiff, however, does point to several examples where male staff attorneys were hired at salaries higher than her own when she was a staff attorney. No question is raised that they were performing equal work. For example, the plaintiff indicates that J. Michael Gray began his employment in February 1989 at a salary of $24,500.00, in comparison to the plaintiff's starting salary in June 1989 of $17,250.00. Jeff Link was paid a $30,000.00 salary when he began work in January 1991, while the plaintiff was receiving $21,000.00. Finally, Robert Stevens who started in December 1990 or January 1991 received a starting salary of $20,000.00. In the case of Stevens, the plaintiff states that he received a raise in 1992 which put his salary ($23,600.00) at $1,000.00 more than what plaintiff was making ($22,600.00) until she received her 1992 raise which increased her salary to $25,200.00.

The defendants argue that the plaintiff's showing falls short of a *prima facie* case. They cite to the Fourth Circuit view that "isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a *prima facie* inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." *See Strag,* 55 F.3d at 948 (quoting *Houck v. Virginia Polytechnic Institute,* 10 F.3d 204, 206–7 (4th Cir.1993)). According to the defendants, all that can be discerned from the salary data available in the record is that the plaintiff was paid more than some staff attorneys and less than others.

The court does find that the plaintiff established a *prima facie* case of discrimination. The plaintiff has pointed to examples where a male employee was paid more for performing equal work under similar working conditions. This brings the court to the next stage of the inquiry, and the burden now shifts to the defendants to show by a preponderance of the evidence that the pay differential can be explained by one of the statutory exceptions.

**B.**

The defendants state that the salary range for its employees is established by its board of directors and that individual salaries relate directly to legal experience, training and market demands. Their reliance on experience is set forth in the defendants' personnel policies which allow the executive director to set a salary by taking into consideration "budgetary constraints, changes in the cost of living, the employee's experience and qualifications, and past performance." (BRLS Personnel Policies Manual excerpt, Pl's Ex. D). The defendants contend that experience is a valid, gender-neutral factor upon which an employer may rely to determine salaries

and it belongs to the fourth statutory exemption, that is, "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

The plaintiff argues that experience is not a valid justification for a salary differential under the Equal Pay Act. Instead, she contends that the only inquiry should be whether experience was necessary for the job. If experience was not a prerequisite, it should not be taken into account. The plaintiff's reliance on the Ninth Circuit's *Hein* case for support in misplaced. *See Hein v. Oregon College of Education,* 718 F.2d 910 (9th Cir.1983). The *Hein* court never reached the second stage of the EPA inquiry, but did note that a teacher's greater experience "may constitute a valid reason for paying him a higher salary based on merit..." *Id.* at 919.

 Moreover, the Fourth Circuit has stated that experience can be a justification under the Equal Pay Act. In *Equal Employment Opportunity Commission v. Aetna Insurance Co.,* the court looked to the legislative history of the Act for its conclusion that experience and background are valid grounds for wage differentials. 616 F.2d 719, 724 (4th Cir.1980) ("As it is impossible to list each and every exception, the broad general exclusion has been also included. Thus, [...] differences based on experience, training, or ability would also be excluded.") (quoting H.R.Rep. No. 309, 88th Cong., 1st Sess. 3, U.S.Code Cong. & Admin. News 1963, p. 687); *see also Strag,* 55 F.3d at 949. Accordingly, this court accepts that an employee's experi-

ence can be a valid justification for a salary differential under the Equal Pay Act.

The next question is whether the defendants can provide proof, by a preponderance of the evidence, that legal experience was indeed the basis for salary determination. *See Brinkley,* 180 F.3d at 613–14. The defendants agree that J. Michael Grey was paid $24,500.00 as a starting salary in February 1989. They point out, however, that he came to the job with six years of legal experience.[5] Likewise, Jeff Link, who started in January 1991 at a salary of $30,000.00, had nearly fourteen years of experience.[6] The defendants also note that in 1989, John Kovac, a part-time staff attorney with 19 years of legal experience, was earning $11,910.00 for half-time work. Thus, the defendants state that the plaintiff's salary was lower than these male attorneys because she had less legal experience.

The defendants maintain that the salary charts demonstrate consistency with regard to paying more experienced attorneys a higher salary than their lesser experienced colleagues. In support, they point out that at the time of the plaintiff's last day of work in February 1999, she had 10.5 years of legal experience and received a salary of $34,314.00. The statistics on the other staff attorneys employed at that time were as follows: a male attorney with 21 years of legal experience and a salary of $42,822.00; a female attorney with 2 years of legal experience and a salary of $28,620.00; a male attorney with 1 year of experience and a salary of $27,500.00; and a female attorney with less than a year of

---

5. The plaintiff argues that Gray actually had 5 years of experience because he was erroneously credited with experience for a non-legal position. Gray, however, described this position on his resume as "Attorney/Research Associate." (Pl.'s Ex. 13) Therefore, the court finds that the defendants were not at error in counting this as legal experience.

6. The defendants state that Jeff Link had 14 years experience at the time of hiring. The plaintiff, however, argues that according to Link's resume, he had only 13 years experience. In examining Link's resume (Pl.'s Ex. 12), the court calculates that Link's legal experience totaled 13 years and 9 months.

legal experience and a salary of $26,000.00. The plaintiff, the second most experienced attorney, was also the second highest paid.

The court finds that the defendants have met their burden of showing, by a preponderance of the evidence, that the pay differential identified by plaintiff was justified by reliance on a factor other than gender. Namely, the salary data provided by the defendants and relied on by the plaintiff present a strong case that salaries were directly related to the amount of legal experience an attorney possessed.

## C.

If the plaintiff wishes to survive summary judgment, she must now produce evidence to controvert the defendant's showing. *See Brinkley,* 180 F.3d at 615 n. 13. The court notes that the plaintiff's rebuttal consisted of many observations which she made from the salary data. The court can reduce them to two main contentions: (1) that the defendants unfairly paid different salaries to men and women attorneys, and that it was not determined by their experience levels; and (2) that the defendants were inconsistent in their allocation of pay raises.

█ As for the first allegation, the court believes the Magistrate Judge's observation was accurate. Namely, the salary data shows that women attorneys, who began work after the plaintiff, received starting salaries commensurate with their male counterparts, and no other female staff attorney was ever paid less than a male staff attorney with equal or less experience.

The plaintiff focuses much of her argument on the case of Robert Stevens who began work as a new attorney with no experience in February 1991 at a salary of $21,000.00. At that time, the plaintiff, with two years experience, was earning $22,600.00. The plaintiff contends that in 1992, Stevens received a raise which put his salary at $23,600.00, while plaintiff was still earning $22,600.00. The plaintiff notes that she too received a raise that year which gave her a salary of $25,200.00. According to the plaintiff, this proves that experience was not a true basis for salary calculation. As the court understands the plaintiff's argument, Stevens was making more than the plaintiff for the time prior to her own raise taking effect. Even if this were true, a temporary pay differential resulting from apparent differences in the timing of raises is not sufficient to rebut the preponderance of evidence put forth by the defendants. Furthermore, according to the "Pay Rate Authorization Forms," found in the plaintiff's exhibits, in 1992, Stevens' raise took effect on February 2, 1992 while the plaintiff's went into effect on February 1, 1992. The plaintiff's argument is therefore moot.

█ As for the plaintiff's contention that the salary increases were implemented inconsistently, the data indicates otherwise. When the defendants announced an across the board increase, for example, in 1996 and 1998, a 4% salary increase was granted, the record shows that employees, both men and women, received 4%. The only visible anomaly was that an attorney, Ann Kline, received a 6% raise in 1998. The defendants explain that they try when possible to give higher raises to newer attorneys who start at comparably low salaries in the legal market. In those years when the defendants did not implement an across the board increase, no evidence suggests that the plaintiff fared unfavorably. Indeed in 1993, she received an 8.25% salary adjustment, comparted to the 5% received by Jeff Link. In 1995, the plaintiff was given a 6.5% adjustment, while Jeff Link received 6%. There is simply no evidence to suggest that men received higher salaries or salary increases than the women.

Therefore, the court finds that the plaintiff has failed to rebut sufficiently the defendant's proof that experience was the factor upon which the defendants based their salary calculations. Accordingly, even were the plaintiff to survive the defendants' summary judgment motion on the waiver issue, the defendants' summary judgment motion on the merits of the claim would be granted.

## V.

For the foregoing reasons, the plaintiff's objections to the Report and Recommendation are overruled, and the defendants' summary judgment motion is granted.

An appropriate Order this day shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum, it is accordingly this day

## ADJUDGED, ORDERED, AND DECREED

as follows:

1. The Magistrate Judge's Report and Recommendation, filed October 29, 2001, shall be, and it hereby is, ACCEPTED;

2. The plaintiff's objections, filed November 8, 2001, shall be, and they hereby are, OVERRULED;

3. The defendants' motion to strike plaintiff's objections, filed on November 13, 2001, as part of their "Response to Plaintiff's Objections," shall be, and it hereby is, DENIED;

4. The defendants' "Motion for Summary Judgment," filed September 6, 2001, shall be, and it hereby is, GRANTED;

5. The plaintiff's "Motion for Continuance," filed December 10, 2001, shall be, and it hereby is, DISMISSED AS MOOT.

The Clerk of the Court is instructed to dismiss this case and strike it from the docket of the court. The Clerk of the Court is also directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record and to Magistrate Judge Crigler.