## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Portsmouth Redevelopment
and Housing Authority

    v.

Philip Ison

January 18, 2005

Case No. (Law) 03-1512

By Judge Mark S. Davis

This matter is before the Court for decision after a non-jury trial. The factual and procedural background of the case, discussion of the issues, and conclusions are set forth below.[1] Because there was no court reporter present for the first day of the trial, testimony is reviewed below in some detail.

---

[1] Plaintiff was represented at trial by C. Gerard Thompson, Esquire, with the firm of Cooper, Spong & Davis, P.C., and defendant was represented at trial by John M. Loeschen, Esquire, with the firm of Payne Gates, Farthing & Radd, P.C.

## I. *Factual and Procedural Background*

Plaintiff Portsmouth Redevelopment and Housing Authority ("PRHA") filed a Summons for Unlawful Detainer, pursuant to Va. Code § 8.01-126, in the Portsmouth General District Court on May 8, 2003. PRHA sought possession of the property located at 739 High Street in Portsmouth, alleging it was the owner; that a month to month lease on the property had been terminated by notice given to the defendant, Philip Ison; and that the tenant, Ison, had not vacated the premises. The General District Court entered judgment for Ison on June 4, 2003, and PRHA appealed to this Court.[2] The trial of the case took place over the course of two days, November 10 and 17, 2004. The case is now ripe for decision.

### A. *Trial Evidence*

Gordon Wheatley testified for the PRHA on November 10 and 17, 2004. He retired from the PRHA on July 7, 2003, and held the position of Assistant Director for Development and Operations at the time of his retirement, having served in various positions at PRHA for twenty-nine years. His job included the responsibility for working with private companies and individuals to develop land owned by PRHA.

Wheatley stated that PRHA and Ison entered into discussions in 1999 regarding Ison acquiring the property located at 739 High Street in downtown Portsmouth. On January 24, 2000, PRHA's Executive Director, Danny E. Cruce, and Ison (on behalf of High Street Galleries, L.L.C., and himself) signed a Development Agreement. Def. Ex. # 3, (admitted over objection of PRHA's counsel). The Development Agreement provides that PRHA has "undertaken a program known as the Crawford Urban Renewal Project,

---

[2] Va. Code § 16.1-106 provides that any order entered in the General District Court may be appealed to the Circuit Court. The trial in the Circuit Court is *de novo*, and the Circuit Court=s jurisdiction on such appeal is derivative, not original. *Addison v. Salyer*, 185 Va. 644, 651, 40 S.E.2d 260, 263-64 (1946); *Commonwealth v. Keel*, 29 Va. Cir. 276, 277 (City of Richmond 1992). Therefore, the Court considers only that which was before the General District Court, *Plaza Motors, Inc. v. Walker*, 8 Va. Cir. 451, 451-52 (City of Richmond 1987), since the proceedings are a continuation of the proceedings in General District Court. *Gemmell v. Svea Fire & Life Ins. Co.*, 166 Va. 95, 100, 184 S.E. 457, 459 (1936).

including the redevelopment of certain properties lying within the City of Portsmouth. . . ." The Development Agreement also indicates that, in furtherance of that goal, PRHA acquired title to property otherwise known as 739 High Street and that Ison and High Street Galleries, L.L.C. ("HSG") offered to purchase and develop that property. The Virginia Supreme Court has repeatedly recognized that such development arrangements are proper governmental functions. *See Charlottesville v. DeHaan*, 228 Va. 578, 592, 323 S.E.2d 131, 138 (1984).

The Development Agreement provides that Ison and HSG agree to purchase the property from PRHA for $50,000.00 and that Ison and HSG shall rehabilitate the property, consisting of 69,000 square feet of commercial and residential space pursuant to plans on file at PRHA. Def. Ex. # 3, para. 1. Furthermore, Ison and HSG were to complete construction of all improvements within nine months of the closing date, with satisfactory completion of such improvements being determined in the sole discretion of PRHA. Ison and HSG were to sign and deliver to PRHA a general warranty deed of bargain and sale for the property and PRHA was to hold the deed in escrow as additional security for completion of the improvements. If Ison and HSG failed to comply with their obligation under the Development Agreement, PRHA was authorized to "record the [d]eed [b]ack and thereby acquire title" to the property. Once the Certificate of Completion was recorded, PRHA was to "void the [d]eed [b]ack and return same to" Ison and HSG. Def. Ex. # 3, para. 1.

The Development Agreement also provided that the "[c]losing [d]ate shall be on or no later than thirty days from the execution" of the Development Agreement "unless extended as provided" in such Development Agreement. Def. Ex. # 3, para. 2. Ison and HSG were to notify PRHA of the proposed date and time for closing at least fifteen days before such proposed date and time of closing. Def. Ex. # 3, para. 5. The closing on the property was contingent upon (1) PRHA unconditionally approving the site plan of Ison and HSG, (2) PRHA unconditionally approving the plans and specifications of Ison and HSG for rehabilitation of the building on the property, (3) Ison and HSG obtaining all necessary building permits, and (4) Ison and HSG submitting to PRHA evidence of compliance with city parking requirements. Failure of Ison and HSG to satisfy any of those conditions, absent a waiver from PRHA, provided PRHA with the option to terminate the Development Agreement. Def. Ex. # 3, para. 6.

Closing was also contingent upon (1) good title from PRHA, (2) sufficient availability of utility service for the property, and (3) appropriate soil and subsurface conditions for construction. Once closing took place, Ison

and HSG were to complete improvements on the property, provided however, that extensions could take place on notice from Ison and HSG to PRHA regarding changes in the final plans and specifications for the improvements requested by the PRHA or regarding unforeseen causes of delay beyond Ison and HSG's control. Def. Ex. # 3, paras. 6 & 8.

The Development Agreement provided that Ison and HSG were to obtain a letter of credit for PRHA's benefit in the amount of $100,000.00, and such letter of credit was not to expire before the Certificate of Completion was recorded. The letter of credit was to guarantee the "timely and satisfactory substantial completion" of the improvements of the property. Until all the improvements were completed, all liens against the property were to only secure the "[p]urchase [p]rice and the soft and hard costs of the construction" of the improvements.

The Development Agreement also contained a provision indicating that the "time for performance of any of the terms" of the Development Agreement "is of the essence." The attachments to the Development Agreement reflect contemplated improvements totaling more than $800,000.00. Def. Ex. # 3, para. 10.

Unless closing contingencies were waived prior to closing, should either party fail to comply with such contingencies, the Development Agreement provided that either party might terminate such agreement, with such termination being the sole remedy available to Ison. Def. Ex. # 3, para. 6. The Development Agreement also contained a merger clause indicating that the Development Agreement and its exhibits constituted the entire agreement and that such agreement "shall not be modified except in writing, executed by all parties. . . ." Def. Ex. # 3, para. 11. However, the Court notes that the Development Agreement admitted in evidence only contains exhibits C, D, and F; that it contains an exhibit G not referenced and which references an exhibit I that is not provided; and that there are blank spaces in the Development Agreement.

Wheatley testified that closing did not take place within thirty days of the Development Agreement being signed on January 24, 2000. He said that Ison notified PRHA that he did not have sufficient funds to close on the property. Wheatley then agreed to extend the closing date, at Ison's request. Ison was occupying the property by April 1, 2000, apparently anticipating a closing. In a letter dated April 1, 2000, to Wheatley, Ison stated that he had already made some renovations and he would like to "renegotiate part of the closing on the property" and "come to terms on the closing." Def. Ex. # 5. At some point in 2000, recognizing the reality of Ison's occupancy of the property, Wheatley said that PRHA and Ison (not HSG) signed a lease agreement. The parties did

not offer the 2000 lease agreement into evidence. However, Wheatley stated that a subsequent lease presented to the Court contained essentially the same language. See Plt. Ex. # 1. The 2000 lease agreement contained a provision indicating that, if Ison purchased the property, he would accept it "AS IS WITH ALL FAULTS." Wheatley also said that he believed the paragraph containing that provision was entitled "option to purchase," though there was no additional language in the provision itself indicating that Ison had the right or option to purchase the property or that the Development Agreement was being referenced.

Wheatley said that on or about August 1, 2000, PRHA agreed to extend the closing date, having received a July 24, 2000, letter from Ison. The August 1, 2000, letter from Wheatley to Ison indicates that, if Ison would agree to complete all first floor improvements by November 12, 2000, and all second and third floor improvements by February 12, 2001, then the PRHA would "draw up a [new] purchase contract" and provide him with a right-of-entry agreement for purposes of completing such construction and would convey the property to Ison upon 100% completion of such work before February 12, 2001. Plt. Ex. # 4. The August 1, 2000, letter from Wheatley to Ison provided a signature line for Ison to indicate his acceptance of this proposed new purchase contract to replace the original Development Agreement, but Wheatley said that Ison never signed and returned the letter.

Ison and Wheatley met on August 7, 2000, to discuss Ison's concerns regarding the completion schedule proposed in Wheatley's August 1, 2000, letter. Plt. Ex. # 5. As a result of that meeting, Wheatley wrote Ison on August 9, 2000, outlining revisions to the proposed purchase contract as follows: (1) various first floor and exterior items to be completed by September 12, 2000; (2) additional exterior and roof items to be completed by November 12, 2000; and (3) second and third floor improvements, including an elevator and stairway, to be completed by April 12, 2001. Plt. Ex. # 5. Like the August 1, 2000, letter, the August 9, 2000, letter provided that, if Ison would agree to these terms, then PRHA would provide Ison with a right-of-entry agreement so that Ison could make such improvements. The August 9, 2000, letter also indicates that Lamar Brown, a Portsmouth Building Official, attended the August 7, 2000, meeting and stated that Ison never obtained a building permit for the construction already performed despite the fact that Brown had told Ison "that plans needed to be submitted to [Brown's] office for the entire scope of the repairs and construction. . . ." Wheatley's August 9, 2000, letter also indicated that the property would be conveyed to Ison "following 100% project completion, provided completion takes place on or before April 12, 2001. . . ." Again, as with the earlier letter, Wheatley's August 9, 2000, letter

provided a signature line for Ison to indicate his acceptance of this proposed new purchase contract, but Wheatley testified that Ison never signed and returned the letter. Plt. Ex. # 5.

Wheatley conceded that Ison told him of numerous difficulties in meeting the time deadlines established by the August 9, 2000, letter. He also conceded that Ison disagreed at times with several reports of PRHA's architect, Kirk Berkeley, regarding the status of the improvements made in 2000 and 2001. Wheatley said that PRHA continued to work with Ison while Ison occupied the property pursuant to the 2000 lease. However, by September 2001, Ison was not making improvements as quickly as PRHA desired, and Wheatley wrote Ison advising him that his lease would be terminated and a new lease would be prepared with a monthly rent of $891.67. According to the letter, the new lease was to continue in existence while Ison worked to complete the improvements on the property.

Wheatley testified that he spoke to Ison after Ison received the September 2001 letter and explained to Ison the rationale for raising the rent from a nominal charge of $1.00 per month to $891.67 per month. Wheatley said that, after this discussion, PRHA decided not to raise the rent and to work further with Ison to try and bring the project to completion. Wheatley conceded that he was not aware of any letter or document extending the April 12, 2001, proposed deadline contained in Wheatley's August 9, 2000, letter, but that, based upon Ison's representations of impending completion, PRHA had, in fact, agreed to extend its proposed April 12, 2001, deadline for completion of this work without establishing a new deadline at that time.

On November 1, 2001, PRHA and Ison signed a new lease agreement. Plt. Ex. # 1. The lease provides that Ison would lease the property for rent of $1.00 per month on a month-to-month basis. Plt. Ex. # 1, paras. 1 and 2. The lease also provides for an automatic renewal of the lease "unless either party hereto gives the other party thirty (30) days written notice of intention to cancel and terminate the Development Agreement prior to the end of the original term hereof or any renewal thereof." Plt. Ex. # 1, para. 2. As further addressed below, this lease also contains a paragraph entitled "Option to Purchase," which was added at Ison's request.

Wheatley stated that he, Ison, PRHA Executive Director Danny E. Cruce, and Assistant Executive Director Marsha McVey met in December 2002 at the request of Ison. He said Ison requested the meeting because he wanted to sublease part of the property to a wine distribution business. Wheatley said that, during the meeting, he asked Ison to provide PRHA with a schedule indicating when he would complete the build out of the property, but Ison did not provide such a document. Wheatley said that after three and one

half years of working with Ison and providing extensions on the project, PRHA finally concluded that it was time to end its efforts and seek other options for the property. On March 5, 2003, Wheatley sent a letter to Ison terminating Ison's lease on the property and terminating the Development Agreement. Plt. Ex. # 2. Realizing that he included an incorrect lease termination date on that letter, Wheatley wrote a second letter on March 6, 2003, changing only the lease termination date from March 31, 2003, to April 30, 2003. The March 6, 2003, PRHA letter begins by recognizing the existence of the Development Agreement and the fact that PRHA extended the closing date on the Development Agreement "from time to time," but states that "all such extended closing dates have come and gone without a closing taking place." Therefore, the PRHA letter advised that the Development Agreement was terminated. The letter went on to recognize the existence of the November 1, 2001, lease agreement and its thirty day notice of termination requirement, indicating that the lease would terminate as of April 30, 2003.

Enclosed with the March 6, 2003, letter was a new lease providing for a month-to-month rental of the property for $1.00 per month. Def. Ex. # 4. However, this lease, unlike the two prior leases, did not contain any section entitled "Option to Purchase." Wheatley said Ison never signed and returned the new lease enclosed with the March 6, 2003, letter. Wheatley also said that he intentionally removed the paragraph entitled "Option to Purchase" because of Ison's prior failure to perform the improvements. Wheatley said that he subsequently received a letter from Ison's attorney, dated March 14, 2003, in which he stated he had been retained "to assist in the completion of agreements executed November 1, 2001, and the Deed of Bargain and Sale dated January 24, 2000." The letter went on to indicate Ison received PRHA's March 5, 2003, letter and "perhaps there has been a misunderstanding" because "Mr. Ison is prepared to close on the property immediately and make payment in full by certified cashier's check at the time of closing." Def. Ex. # 2.

Wheatley stated that he realized PRHA would have the benefit of Ison's improvements to the property upon termination of the lease, but he said Ison had the benefit of using the property essentially rent-free since 2000. Wheatley said he had become familiar with downtown Portsmouth rental rates during his years at the PRHA and that the rental rates of properties adjacent to 739 High Street was about $3.00 to $4.00 per square foot during the relevant time frame of 2000 to 2004. Wheatley said that, even if one assumed a rental value of only $1.00 per square foot (substantially less than the adjacent property), Ison had the benefit of the property for over four years, paying only $12.00 per year, versus a minimum rental value of $66,000.00 per year.

Philip Ison testified that, after he entered into negotiations with PRHA, the Development Agreement was prepared by PRHA and forwarded to him around January 2000. Ison said that the Development Agreement sat on his desk until approximately September 2000, when he signed it. At the time he signed it, exhibit G to the Development Agreement contained general descriptions of the improvements to be made on the property.

Ison stated that the notary certificate on the Development Agreement was in error, since it reflected him signing the document on January 24, 2000, when he really did not sign it until September of 2000. Ison said the notary blocks were not filled in when he signed in September 2000. At the same time, in September 2000, Ison said he signed the first lease on the property and that he requested PRHA include language in that lease providing him with an option to purchase the property.

Ison testified that, while the Development Agreement sat on his desk from January 2000 through September 2000, he continued to negotiate with PRHA. Ison's April 1, 2000, letter to Wheatley was in furtherance of such negotiations, according to Ison, as was his July 24, 2000, letter to Wheatley. Ison stated that his request in the July 24, 2000, letter that PRHA close on the property was *not* a request to close on the Development Agreement but was a request to close pursuant to his ongoing efforts to reach an agreement with PRHA. Ison said that he did receive PRHA's letters of August 1, 2000, and August 9, 2000, in which PRHA sought to come to terms on a purchase contract, but Ison said he was not sure whether he ever signed the letters and returned them, as requested in such letters. Ison said he opened the first floor of the property in September 2000, and he continued to make improvements to the property through the date his lease was terminated in 2003. He said the first floor is now in use as a wholesale/resale showroom, that the second floor is used for offices, and the third floor is empty.

Ison testified that his efforts to complete improvements on the property were hampered by a lawsuit in which he was involved in West Virginia. He said that lawsuit also prevented him from obtaining the $50,000.00 needed to close on the property. After signing the November 1, 2001, lease agreement, he continued making improvements. The lawsuit in West Virginia was resolved around the beginning of February 2003. Ison said that, around that same time, he met with Wheatley, Cruce, and McVey to discuss how the deal could be brought to closure. Ison said Wheatley, Cruce, and McVey agreed that Ison was "substantially done" and that only cosmetic work was left for completion. Ison said that, during that meeting, he said he was ready to close and Cruce responded "[l]et's get the paper work done and close." Ison left that meeting with the understanding that he was to await a letter from Cruce

explaining the closing procedure and date; that he was to await a visit from PRHA's architect to confirm completion of required improvements; and that he was to await a punch list of items to be completed along with an accompanying completion schedule. Ison stated that he was also in discussions with Resource Bank attempting to arrange financing for the closing.

Ison testified that he had no further discussion with PRHA representatives between the January/February 2003 meeting he described and his receipt of the March 5, 2003, letter from Wheatley terminating the Development Agreement and the lease. Plt. Ex. # 2. Ison also received the amended March 6, 2003, termination letter. He said that the day he received the March 6, 2003, amended termination letter he spoke with Wheatley, who said that Blackwater Development was prepared to buy the property.

Ison said that he arranged for the March 14, 2003, letter, referenced above, to be sent by his attorney and he understood that letter to be an exercise of his option to close.[3] He also admitted that he sent a letter to Cruce on June 4, 2003, stating that "[p]ursuant to my last conversation with you, Mr. Wheatley, and Ms. McVey, and pursuant to the terms of our Lease Agreement and the terms contemplated in the Development Agreement, I am ready, willing, and able to close." Ison went on to write, "I hereby exercise my option to purchase the property located at 739 High Street in Portsmouth, Virginia, for the $50,000.00 as we agreed." Ison added, "I wish to thank you for working with me during my legal problems with my past partner." Plt. Ex. # 7 (letter admitted over objection of Ison's counsel).

Ison reviewed exhibit G to the Development Agreement and said that at the time of the trial he had "substantially completed" work on that list of improvements, but not completely. He stated that he had "put $246,000.00 in the property so far" and admitted that he still needs to complete installation of an elevator (costing approximately $47,000.00) and a heating, ventilation, and air conditioning system (costing approximately $18,000.00). See Def. Ex. # 6 (reflecting improvements totaling $246,970.00). Ison said he has performed little work since receipt of the March 6, 2003, termination letter, though he had installed windows after March 6, 2003.

The next witness was Dorah Katherine Lobacz, an Executive Assistant at PRHA for the past three years. She was shown the Development Agreement and stated that she would never have notarized the signatures of Ison and

---

[3] The March 14, 2003, letter was written on Ison=s behalf by Gary C. Byler, Esquire. Ison also testified that he was represented by a separate law firm during the pre-March 5, 2003, time frame and he was advised by that law firm that the deal he had with PRHA was the best he "was going to get."

Cruce on January 24, 2000, unless such signatories were actually present with her on that date. She said she had a specific memory of Ison being at PRHA and signing a document in her presence, though she did not have a specific memory whether it was the Development Agreement or another document.

PRHA Executive Director Danny E. Cruce then testified, stating that he has been with PRHA for twenty-two years. Cruce said that he signed the Development Agreement at the time shown in the document. He participated in a meeting in December 2002 with Ison, Wheatley, and McVey. The purpose of the meeting was to outline deficiencies in scheduled improvements of the property and to hear Ison's request to use part of the property for wine distribution. Cruce said Ison did not indicate during that meeting that he wanted to exercise any option to purchase the property. He also said PRHA did not agree to put off closing until the contemplated improvements were completed. Irrespective of whether there was such an agreement, Cruce said such improvements were never completed.

Cruce said that he believed he had told Ison during the December 2003 meeting that the Development Agreement and lease were going to be terminated. Cruce had no memory of Ison saying during that meeting that he wanted to close on the property. Cruce was asked whether PRHA terminated the Development Agreement and lease because he (Cruce) learned that the property was more valuable than previously thought. He stated that, in June of 2003, the Urban Land Institute issued a report regarding redevelopment prospects for portions of downtown Portsmouth and the results of that report probably made the property more valuable. Cruce said that he was probably familiar with some of the likely recommendations in that report prior to March 6, 2003, though nothing in the report recommendations about which he was familiar as of March 6, 2003, was inconsistent with the use to which Ison had devoted the property.

Marsha McVey was the last witness to testify. McVey is the Assistant Director for Marketing at the PRHA, where she has worked for the past twenty-five years. She said that she participated in no meeting with Ison, Wheatley, and Cruce during February and March 2003. However, she did participate in a meeting with the three of them in early December 2002. The reason for the meeting was Ison's request to sublease 800 square feet of the property to a wine wholesale distributor. McVey said she had no recollection of Ison indicating during the meeting that he wanted to exercise an "option to purchase" the property. However, Ison did bring up closing during the meeting and he was asked to provide: (1) an updated reuse plan, (2) a list of items yet to be completed, (3) a cost estimate for those items yet to be completed, and (4) a timetable for completion of those items.

McVey stated that, during the December 2002 meeting, Ison said he would provide PRHA with the four items listed above shortly after the beginning of January 2003. However, PRHA did not receive such items before or after the March 6, 2003, letter was sent. When asked how she recalled this information, McVey said she kept a file on this project and she kept notes from meetings she attended about the project, though she did not become involved in the project until July 2000. She said that, after July 2000, she attended meetings with Ison and the PRHA representatives. McVey admitted that she may have spoken with Ison, after the December 2002 meeting, and provided him with a recommendation for an elevator he was seeking to purchase.

## B. *Findings of Fact*

The Court makes the following relevant findings of fact.

In 1999 PRHA and Ison entered into discussions regarding Ison's acquisition and development of the property located at 739 High Street in the City of Portsmouth.

PRHA and Ison signed the Development Agreement on January 24, 2000. It was obvious to the Court from the halting and at times confusing manner in which Ison testified that he is a well intentioned but apparently poor factual historian and the Court discounts Ison's testimony that he signed the Development Agreement in September 2000. Closing did not take place within thirty days of signing the Development Agreement because Ison did not have sufficient funds to close and begin significant improvements.

PRHA and Ison entered into a lease agreement some time in 2000 for a nominal rental rate. On or about August 1, 2000, PRHA agreed to extend the closing date of the Development Agreement.

On or about August 1, 2000, PRHA offered to prepare a new purchase contract if Ison would agree to a new improvement completion schedule, but Ison requested changes to the proposed modification and never accepted the offer.

After discussions with Ison on or about August 7, 2000, on or about August 9, 2000, PRHA sent a letter to Ison and offered to prepare a new purchase contract if Ison would agree to a new improvement completion schedule reflecting a final completion date of April 12, 2001, but Ison never signed the August 9, 2000, letter. Ison continued occupancy of, and improvements to, the property after August 9, 2000.

PRHA was not satisfied with Ison's progress in making improvements and wrote Ison in September 2001 indicating the 2000 lease agreement would

be terminated and a new lease agreement would be offered without any paragraph entitled "Option to Purchase" and with a monthly rental of $891.67 while Ison proceeded with improvements. However, Ison persuaded PRHA to work with him and again extend the date for completion of improvements and closing, with rent remaining at $1.00 per month.

PRHA and Ison entered into a new lease on or about November 1, 2001, with the terms reviewed above in the discussion of plt. Ex. # 1. The new lease was changed at Ison's request to include the language contained at paragraph 33, entitled "Option to Purchase." At the time the November 1, 2001, lease agreement was signed, the parties had an oral agreement (amending the Development Agreement) that Ison was to complete the agreed-upon improvements and once those improvements were 100% completed they would close on the sale of the property with Ison paying $50,000.00 at such closing. No specific date was agreed upon for completion of the improvements. PRHA and Ison relied on this agreement and, based on such reliance, Ison made some additional improvements to the property and PRHA continued to rent him the property for nominal rent. Ison continued to make improvements to the property from November 1, 2001, through December 2002.

Ison met with Cruce, Wheatley, and McVey in early December 2002 to discuss his request to sublease space on the property to a wholesale wine distributor.

During the December 2002 meeting, Ison indicated he wanted to move forward with closing and he was asked to provide PRHA with an updated reuse plan, a list of items yet to be completed, a cost estimate for those items yet to be completed, and a timetable for completion of those items, all such information to be provided shortly after the beginning of 2003. Ison did not provide this information prior to March 6, 2003.

On March 6, 2003, Wheatley sent a letter to Ison immediately terminating the Development Agreement (in its orally amended form) and terminating the November 1, 2001, lease agreement as of April 30, 2003.

Ison's attorney wrote PRHA on March 14, 2003, indicating Ison was prepared to close on the property immediately. This was the first time that Ison or a representative of his had unequivocally indicated he was ready to close. However, Ison could not close because he had failed to comply with the condition precedent to such closing, completion of improvements.

Ison wrote PRHA on June 4, 2003, indicating he was ready to close on the property "pursuant to the terms of our Lease Agreement and the terms contemplated in the Development Agreement."

PRHA and Ison believed that the January 2000 Development Agreement, in its orally amended form, and the lease agreement of November 1, 2001, governed their business relationship as of March 6, 2003, as evidenced (among other evidence) by their respective letters of March 6, 2003, and June 4, 2003, referencing such agreements.

## II. *Discussion*

### A. *Contentions of the Parties*

PRHA contends that the November 2001 lease agreement provides it with the power to terminate such lease on thirty days notice; that its right to terminate was properly exercised; that the lease agreement does not contain language providing Ison with an option to purchase the property; that the Court should not look to the Development Agreement (in its original or amended form) for the embodiment of that option; and that, even if the lease contained an option to purchase or the Court looked to the Development Agreement, Ison failed to exercise the option or to request closing in a timely manner.

Ison contends that the November 2001 lease agreement contained an option to purchase the property; that he timely exercised his option before March 6, 2003; that he also timely exercised his option to purchase between the time he received the March 6, 2003, PRHA letter and the expiration of the lease period on April 30, 2003; that it is not necessary to look to the amended Development Agreement for him to exercise his option to purchase; that, even if it is necessary to look to the amended Development Agreement, the terms of the orally modified Development Agreement provide him with a right to purchase the property; that the option was exercised in a timely fashion; and that he is still prepared to close on the property.

### B. *Unlawful Detainer*

This matter is before the Court on PRHA's action for unlawful detainer pursuant to Va. Code § 8.01-126. That Code section provides that "[i]n any case when possession of any house, land, or tenement is unlawfully detained by the person in possession thereof, the landlord, his agent, attorney, or person, entitled to the possession may present to a magistrate, clerk, or judge of a general district court a statement under oath of the facts which authorize the removal of the tenant or other person in possession . . . and thereupon such magistrate, clerk, or judge of a general district court shall issue a summons

against" such person alleged to be in unlawful possession to appear in such court. Va. Code § 8.01-128 provides that "[i]f it appears that the plaintiff was forcibly or unlawfully turned out of possession, or that it was unlawfully detained from him, the verdict or judgment shall be for the plaintiff for the premises. . . ." The action for unlawful detainer pursuant to these statutes is purely statutory and it is a civil action, with the plaintiff having the obligation to carry its burden by a preponderance of the evidence. *Daily v. Rucker*, 151 Va. 72, 76, 144 S.E. 466, 467 (1928); *Kincheloe v. Tracewells*, 52 Va. (11 Gratt.) 587 (1854); 1 Michie's Jurisprudence, *Forcible Entry and Detainer*, § 2. A similar statute has been in the statutes of the Commonwealth of Virginia since 1789, the purpose of such statute being to discourage unlawful entries and to let it be known that disputes over possession must be resolved in an orderly manner through the courts rather than through force. *See Southern Ry. v. Lima Wood etc. Inc.*, 156 Va. 829, 833, 159 S.E. 69, 70 (1931).

Following the statutory scheme, this case proceeded through the General District Court to this Court on appeal. While the action is currently pending at law, Va. Code § 16.1-114.1 provides that "[a]ctions or proceedings appealed . . . from district courts shall be tried according to the principles of law and equity, and when the same conflict the principles of equity shall prevail." *Principal Residential Mortgage Corp. v. Curtis*, 61 Va. Cir. 151, 154 (Roanoke 2003) (applying principles of equity to unlawful detainer action appealed from general district court). With these principles in mind, the Court must now consider whether "possession was unlawfully detained from" PRHA. Va. Code § 8.01-128.

## C. *PRHA's Authority to Terminate the Lease*

The November 2001 lease agreement provides that the "term of the lease shall be for a period of one month from November 1, 2001, with an automatic renewal on a month-to-month term thereafter, unless either party hereto gives the other party thirty days written notice of intention to cancel and terminate the Agreement prior to the end of the original term hereof or any renewal thereof." Plt. Ex. # 1, para. 2.

Pursuant to this paragraph, either party is free to cancel the lease by giving thirty days notice, and Ison does not contest PRHA's authority to give notice of such termination, though he does contest the effect of such termination.

Pursuant to the termination provision in the lease, PRHA wrote Ison on March 6, 2003, giving notice that the lease was terminated effective April 30, 2003. Ison does not contest the fact that such letter was mailed and that he

received the letter. Rather, Ison contends that he had an option to purchase and that he timely exercised such option both before the March 6, 2003, letter and again before the April 30, 2003, termination.

D. *Option to Purchase Pursuant to Lease and Without Consideration of Parol Evidence*

Since Ison contends that he had an option to purchase the property and that he properly exercised this option, in effect trumping PRHA's right to terminate the lease and the orally amended Development Agreement, it is necessary to first determine whether Ison had such an option.

Paragraph thirty-three of the November 1, 2001, lease agreement provides as follows:

> 33. *Option to Purchase.* In the event of a purchase hereunder, [Ison] hereby accepts the Property, including, but not limited to, all appliances, fixtures, heating and cooling equipment and systems, plumbing systems (including well and septic), electrical systems, physical structure and roof in their present condition "AS IS WITH ALL FAULTS" as of the date of Lessee's initial occupancy of the demised premises.

Ison first claims that this language provides him with the right to purchase the property, even without reference to the orally amended Development Agreement, and we will therefore begin by examining this contention.

An option:

> is a contract by which the owner of property agrees with another that he shall have the right to purchase the same at a fixed price within a certain time. It is in legal effect an offer to sell, coupled with an agreement to hold the offer open for acceptance for the time specified, such agreement being supported by a valuable consideration . . . so that it constitutes a binding and irrevocable contract to sell if the other party shall elect to purchase within the time specified.

*Shirley v. Van Every,* 159 Va. 762, 770, 167 S.E. 345, 348 (1933). Such an option contract, like other contracts, must demonstrate a meeting of the minds of the parties on every material term of the agreement. *Smith v. Farrell,* 199

Va. 121, 127-28, 98 S.E.2d 3, 7 (1957) ("[i]n order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference."). Furthermore, "[u]ntil all understand alike, there can be no assent, and, therefore, no contract." *Progressive Constr. Co. v. Thumm*, 209 Va. 34, 30, 161 S.E.2d 687, 691 (1968). In other words, a document representing an option must evidence a contract by the parties. *See IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 124 (3d Cir. 1986).

The language of this lease paragraph begins with the words "[i]n the event of a purchase hereunder. . . ." These words, even when read in conjunction with the paragraph heading "Option to Purchase," do not by themselves provide Ison with a right to purchase the property because it does not reveal a clear offer for Ison to purchase the property.

Paragraph twenty-four of the lease agreement provides that the headings of the sections of the lease are inserted for convenience only "and do not alter or amend the provisions that follow such headings." "While labels may be helpful in determining contractual intent, they are not controlling." *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 180, 519 S.E.2d 133, 138 (1999). The heading disclaimer contained in paragraph twenty-four helps clarify the intent of the entire lease agreement. However, even if this disclaimer were not present, the heading and accompanying language of para. 33 provide no right to purchase the property.

Without an offer, there can be no acceptance, as required for the formation of an option contract. *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980). Without such an offer, there is no prospect of assent. *See Whitelaw v. Brady*, 3 Ill. 2d 583, 589, 121 N.E.2d 785, 789 (1954). Therefore, the language of the lease agreement alone does not contain an offer for Ison to purchase the property and there is no option contract.

*E. Option to Purchase – Parol Evidence*

If Ison is to prevail on his defense to the unlawful detainer action by asserting he had an option to purchase the property, he must do so by reference to some agreement or evidence outside the four corners of the November 1, 2001, lease agreement. However, since evidence outside the lease agreement itself (parol evidence) is only admissible in limited circumstances, we must determine whether those circumstances apply here. In order to do so, we first look to the parol evidence rule.

The parol evidence rule developed at common law as a principle of contract interpretation. *Crafts v. Broadway National Bank*, 142 Va. 702, 128

S.E. 364, 366 (1925) (parol evidence rule is grounded in common law). While the rule is not a creature of the formal rules of evidence, as its name suggests, it does function as a rule of evidence. *See Spears v. Warr*, 2002 UT 24, * 18, 44 P.3d 742, 750 (2002); Friend, § 20-1 ("[t]he rule is, in fact, not a rule of evidence but of substantive law).

Professor Williston's formulation of the common law parol evidence rule is as follows: "this rule requires, in the absence of fraud, duress, mutual mistake, or something of the kind, the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated writing." 4 Williston, *Contracts* § 631 (3d ed. 1957). The Virginia Supreme Court has expressed this rule by saying that *where a writing is, on its face, clear, explicit, and complete,* the parol evidence rule (itself a form of conclusive presumption) operates. On such facts, it is "conclusively concluded that the writing contains the whole contract and is the sole evidence of the agreement." *Durham v. National Pool Equip. Co.*, 205 Va. 441, 446, 138 S.E.2d 55, 59 (1964). Application of the rule is not a simple matter, however. As Professor Thayer observed when he spoke of this rule, "[f]ew things are darker than this, or fuller of subtle difficulties." Thayer, *A Preliminary Treatise on Evidence at Common Law* 390 (1898). In their text, *Contracts*, Professors John D. Calamari and Joseph M. Perillo observe that:

> Much of the fog and mystery surrounding these subjects stems from the fact that there is a basic disagreement as to the application of the parol evidence rule and as to the best method of ascertaining the intention of the parties – the process of contractual interpretation. The cases and treatises of the contract giants [Williston and Corbin] tend to conceal this conflict. While frequently masking disagreement by using the same terminology, Professors Williston and Corbin are often poles apart in the meaning they attach to the same terms.

Calamari and Perillo, *Contracts*, § 3-1 (2d ed. 1977). However, there is a broad area of substantial agreement.

Because the Virginia decisions do not provide a comprehensive overview of the parol evidence rule and its application, it is sometimes easier to understand the context, organization and application of this rule by reference to the commentators. The following lengthy, but thorough, excerpt from Farnsworth on *Contracts* is particularly helpful in providing that overview. Professor Farnsworth observed that:

The parol evidence rule is best understood in light of its purpose: to give legal effect to whatever intention the parties may have had to make their writing at least a final and perhaps also a complete expression of their agreement. If the parties had such an intention, the agreement is said to be "integrated," and the parol evidence rule bars evidence of prior negotiations for at least some purposes. If the parties had no such intention, the agreement is said to be "unintegrated," and the parol evidence rule does not apply.

If an agreement is integrated, it is considered "partially integrated" or "completely integrated" according to the degree to which the parties intended the writing to express their agreement. If they intended the writing to be a final expression of the terms it contains, but not a complete expression of all the terms agreed upon — some terms remaining unwritten — the agreement is partially integrated. If the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains, the agreement is completely integrated.

The legal effect of a determination that the agreement is integrated, according to the Restatement Second, is that "evidence of prior or contemporaneous agreements or negotiations is not admissible to contradict a term of the writing." If the agreement is only partially integrated, however, evidence of prior agreements or negotiations is admissible to supplement the writing though not to contradict it. If the agreement is completely integrated, not even evidence of "a consistent additional term" is admissible to explain the writing.

In applying the parol evidence rule, therefore, agreements can be classified as unintegrated, partially integrated, or completely integrated. This can be done by asking two questions. First: is the agreement integrated? Second: if it is integrated, is it completely or only partially integrated?

Although there is general agreement on this analysis, controversy arises as to its application. "There is scarcely any subject more perplexed," lamented one court, "than in what cases and to what extent parol evidence shall be admitted." Those who favor broad application of the rule have a champion in Williston, and those who favor a narrow application have a champion in

Corbin. The trend has favored Corbin's view. The [Uniform Commercial] Code reflects this view, and the Restatement Second has been influenced by both Corbin and the Code.

We turn to the first question: is the agreement integrated? The answer turns on whether the parties intended the writing as a final expression of the terms it contains, even if the writing was not intended as a complete and exclusive statement of all terms on which agreement was reached. No particular form is required for an integrated agreement, and the writing need not be signed by either party. Although preliminary written proposals exchanged by the parties are not ordinarily intended as final expressions of the terms they contain, they may later be assented to as such – orally, in writing, or by other conduct. The character of the writing itself is often persuasive as to the intention of the parties. Indeed, it has been held that if a writing appears in view of its thoroughness and specificity to embody a final agreement on the terms that it contains, the agreement is conclusively to be taken as an integrated one with respect to those terms. However, the Restatement Second reflects the prevailing view that other evidence, including evidence of prior negotiations, is still admissible to show that the writing was not intended as a final expression of the terms it contains. Thus the intention of the parties is determined from all the circumstances, including their language and other conduct, just as intention is determined for any other purpose.

If an agreement is only partially integrated, it must then be determined whether the evidence of prior negotiations sought to be introduced would be "consistent" with the writing and would therefore merely "explain" or "supplement" it, or whether it would "contradict" a term of the writing. In the former case it is admissible but in the latter it is not. There is no requirement that the writing be ambiguous in order for the evidence to be admitted. As might be expected, the outcome in borderline cases often depends on whether the court is sympathetic to the parol evidence rule itself. . . .

We turn now to the second question: assuming that the agreement is integrated, is it completely, as distinguished from only partially, integrated? The answer depends on whether the parties intended the writing as a complete and exclusive expression of all terms on which agreement was reached, as distinguished from merely a final expression of the terms that it contains. The sharpest

disagreement in connection with the parol evidence rule has been over the application of this test. It is one thing to accept that what is written cannot be contradicted. It is quite another to accept that what is written cannot be supplemented even by consistent terms. It is generally agreed that the mere fact that the agreement is integrated does not give rise to a presumption that it is completely integrated. The commentary to the [Uniform Commercial] Code concurs in rejecting "any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon." The point in dispute is whether the fact that the writing appears on its face to be a complete and exclusive statement of the terms of the agreement establishes conclusively that the agreement is completely integrated.

In Williston's view, it does. "It is generally held that the contract must appear on its face to be incomplete in order to permit parol evidence of additional terms." Many courts, particularly in cases decided in the first half of the twentieth century, agreed that the issue is to be resolved by first inspecting the writing alone. If, on its face, the agreement appears to be completely integrated, the court should simply accept that this is so. Some courts have recognized the futility of trying to tell whether the writing is completely integrated without looking beyond the four corners of the writing and so have softened the test. These courts read the writing in the light of surrounding circumstances – excluding, however, the most vital circumstances of all, the evidence of the prior negotiations themselves.

The opposing camp, inspired by Corbin, rejects even this exclusion. According to Corbin, account should always be taken of all circumstances, including evidence of prior negotiations, since the completeness and exclusivity of the writing cannot be determined except in the light of those circumstances. "The writing cannot prove its own completeness and accuracy." The trend clearly favors Corbin. The Restatement Second commentary agrees that "a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.". . . .

The fact that an agreement is completely integrated does not, of course, affect an attempt to show an entirely separate and distinct agreement between the same parties. This truism forms the basis

for the "collateral agreement" rule. Under this rule even the finding of a completely integrated agreement does not preclude a showing of a "collateral agreement," as long as it does not contradict the main agreement. Although courts have said that the agreement must be "collateral" in form, they have not insisted that it be supported by consideration distinct from that supporting the main agreement. It is enough if the collateral agreement is one that "in the circumstances might naturally be omitted from the writing."

In *Mitchill v. Lath*, the leading collateral agreement case, a purchaser of land under a written contract attempted to show a prior agreement by the vendor to remove an unsightly ice house from a nearby tract. The New York Court of Appeals held that the parol evidence rule precluded such a showing because an inspection of this contract shows a full and complete agreement, setting forth in detail the obligations of each party. On reading it, one would conclude that the reciprocal obligations of the parties were fully detailed. . . . Were such an agreement [as to the ice house] made it would seem most natural that the inquirer should find it in the contract. [*Mitchill v. Lath*, 160 N.E. 646, 647 (N.Y. 1928).]

Other courts, however, have been more flexible in determining whether a term might "naturally" have been omitted from the writing. It has been held, for example, that there was nothing "inherently improbable in the fact that, as a contemporaneous independent contract," the parties to a contract for the conditional sale of automobiles orally agreed that the proceeds of insurance covering missing parts should be paid to the buyer. [*State Fin. Corp. v. Ballestrini*, 150 A. 700, 702 (Conn. 1930).] And it has been held that "it would *not* be expected" that an oral agreement under which a distiller was to give liquor distributors another distributorship would be integrated into the sales contract under which the distiller bought the distributorship. [*Lee v. Joseph E. Seagram & Sons*, 552 F.2d 447, 452 (2d Cir. 1977).] What is in effect decided in such cases, however, is that the agreement is only partially integrated. Analysis in terms of "collateral agreement" obscures the real issue. Only if the writing contained a binding merger clause, precluding argument that the agreement is only partially integrated, would the court have to determine whether there was a true collateral agreement.

E. Allen Farnsworth, *Contracts*, § 7.3 (2d ed. 1990). With this background in mind, we apply these general principles to the facts of this case and the law of Virginia. The first question that must be asked is whether the lease agreement is integrated. In Virginia, the answer to this question turns on whether it is the final and complete agreement of the parties.

### 1. *Is the lease intended as the final agreement?*

Virginia has consistently adhered to a view of the parol evidence rule that is more consistent with Professor Williston's formulation above.[4] Eric A. Posner, *The Parol Evidence Rule, The Plain Meaning Rule, and the Principles of Contractual Interpretation*, 146 U. Pa. L. Rev. 533, n. 8, 16 (January 1998); Friend, § 20-3. It is clear that the Virginia Supreme Court, following Professor Williston's approach, has said extrinsic, parol evidence is not considered in determining whether or not the instrument is final and complete. Such a determination must be made from the face of the document alone. *Cohan v. Thurston*, 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982) (for extrinsic evidence to be admitted to explain an ambiguity in a document, such "ambiguity must be apparent on the face of the instrument" since "[p]arol evidence cannot be used to first create an ambiguity and then to remove it."). Therefore, we look to the instrument itself.

In this case the language of paragraph thirty-three of the November 1, 2001, lease agreement provides as follows:

> 33. *Option to Purchase*. In the event of a purchase hereunder, [Ison] hereby accepts the Property, including, but not limited to, all appliances, fixtures, heating and cooling equipment and systems, plumbing systems (including well and septic), electrical systems, physical structure and roof in their present condition "AS IS WITH ALL FAULTS" as of the date of Lessee's initial occupancy of the demised premises.

This provision is silent on the terms of any purchase, merely stating that, if a purchase takes place, such sale is "AS IS WITH ALL FAULTS." The presence of the language begs the question of why it is there. It is certainly possible,

---

[4] It has been suggested that the Virginia Supreme Court has moved away from strict adherence to the Williston approach and toward the Corbin approach. Currant Decisions Note, 7 Wm. & Mary L. Rev. 189 (1966) (*citing Durham v. National Pool Equipment Co. of Va.*, 205 Va. 441, 138 S.E.2d 55 (1964)).

looking at the language of the document alone, that it is only intended to place Ison on notice that, if he ultimately buys the property, he will take it "AS IS," though it raises some question in the readers mind as to why it is there.

PRHA protests that paragraph twenty-nine precludes the Court's consideration of the heading. PRHA also protests that the lease agreement, at paragraph twenty-nine, provides that all amendments and modifications must be in writing. However, such a clause (as contained in paragraph twenty-nine) may be overcome by a tenant's assertion of "additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." *Shevel's, Inc. v. Southeastern Associates, Inc.*, 228 Va. 175, 183, 320 S.E.2d 339, 343 (1984). Where such a defense is involved, a "tenant, therefore, is not bound by >the four corners of the lease'." *Id.* at 183, 320 S.E.2d at 344. While the tenant's burden may be a heavy one in the face of such contract language, "it is no bar to the admission of parol evidence for that purpose." *Id.*

Ison asks the Court to look to evidence outside the lease agreement itself and conclude that the lease agreement's treatment of paragraph thirty-three reveals such agreement is not final and is incomplete.[5] Of course, as noted above, the Court is simply not free to examine evidence outside the face of the document to make this threshold determination. While this language is not precise, one cannot say from viewing the language alone that it is not a final and complete expression of that which is contained in the paragraph. Looking at the language alone, one could conclude that the parties simply intended to express what would occur should Ison purchase the property he was leasing from PRHA. While it would be odd to include such a provision without there being another agreement, the Court simply cannot say from the face of the document that the parties did not intend the lease agreement to be their final agreement with regard to the contents of paragraph thirty-three.

---

[5] The Virginia Statute of Frauds requires that all contracts for the sale of land be in writing, the purpose being the minimization of fraud and perjury. While the Statute of Frauds, Va. Code § 11-2, might be seen as an impediment to Ison=s claim that missing contractual terms (permitting him to purchase the property) are provided by an oral modification to the Development Agreement, in this case representatives of PRHA concede that there was an oral modification to the Development Agreement, and Ison *relied upon that oral modification* and continued making improvements. Because Ison partially performed on the oral modification (by continuing to make improvements), PRHA cannot assert the Statute of Frauds. *See T. v. T.*, 216 Va. 867, 873, 224 S.E.2d 148, 152 (1976); *Guzy v. Hoban*, 43 Va. Cir. 33 (Va. Beach 1997).

Even if the Court could look outside the document, a review of such evidence would show that the parties intended the lease agreement as the "final" expression of their lease agreement. Ison alleges a separate oral agreement modifying the Development Agreement and supplying the other missing terms of the lease in order to establish the entire lease/contract. *Reed v. Dent*, 194 Va. 156, 163, 72 S.E.2d 255, 259 (1952). As stated in the findings of fact above, well prior to the November 2001 lease, in August 2000, PRHA wrote Ison on two occasions seeking to memorialize the terms of agreement modifying the January 2000 Development Agreement. Ison never signed the letters containing such terms though he continued to make improvements. After PRHA backed away from its September 2001 proposal to increase Ison's rent, a new lease was entered into in November 2001 and the paragraph entitled "Option to Purchase" was included at Ison's request and, in recognition of the ongoing development arrangement. Ison continued to make improvements, though belatedly, and PRHA continued to lease the premises to him for $1 per month rent with the understanding that he could purchase the property if he met certain conditions. When Ison failed to meet the improvement deadlines and progress toward completion, PRHA wrote him in March 2003 simultaneously terminating *both* the lease and the Development Agreement (apparently in modified form). All of this evidence suggests that the parties did see the lease as the final (not necessarily "complete") expression of their agreement. At the time the parties signed the November 2001 lease agreement, they did not plan to negotiate additional lease terms. Instead, they apparently saw the lease in place at that time as the final expression of their agreement on the points addressed in such lease. Both PRHA and Ison proceeded with the development project *and* lease, at the same time, after the November 2001 lease. The November 2001 lease was modified by adding paragraph 33, apparently to reflect Ison's desire for some recognition of the parties' ongoing development arrangement, further suggesting that with such modification in place, the parties saw the lease as the final expression of their agreement as to those matters contained in such lease.

Just because the parties intended the lease as the final and complete expression of the terms contained in their lease agreement, making it an integrated agreement, that does not necessarily mean it was intended as the complete expression of all the terms agreed upon. While the case law in Virginia appears to treat the question of finality the same as the question of completeness (probably because questions are limited by examination of the document alone), they are in fact separate determinations since it is theoretically conceivable that an examination of the face of a document could

lead to the conclusion that such document was intended as the final expression of the terms that are contained in such agreement, but not the complete expression of all the terms agreed upon.

### 2. *Is the lease a complete or partial integration?*

Again, in making this determination we look to controlling precedent of the Virginia Supreme Court since the legislature has not addressed this issue.[6]

### a. *Partial Integration Doctrine*

The Virginia Supreme Court defines the parol evidence rule as follows:

> Parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to alter, vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional written instrument.

*Walker & Laberge Co. v. First Nat'l Bank of Boston*, 206 Va. 683, 689, 146 S.E.2d 239, 243 (1966); *see* Charles E. Friend, *The Law of Evidence in Virginia*, § 20-1 (6th ed. 2003). As noted above, the parol evidence rule only applies when the instrument is intended by the parties as the complete, final, integrated embodiment of the contract. Friend, § 20-2. Virginia has adopted the position that, where it is apparent from the face of the document itself that there are other terms not included in the document, the parol evidence of the written terms may be supplied to establish the entire contract. *Reed v. Dent*, 194 Va. 156, 163, 72 S.E.2d 255, 259 (1952). This concept is known in Virginia as the "partial integration doctrine." *High Knob, Inc. v. Allen*, 205 Va. 503, 506, 138 S.E.2d 49, 52 (1964). Since the final form of a contract may not reflect the complete agreement or the course of dealing between the parties based on their complete agreement, "parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." *High Knob, Inc.*, 205 Va. at 506, 138 S.E.2d at 52.

---

[6] Virginia has adopted the Uniform Commercial Code, which contains a statutory parol evidence rule. Va. Code § 8.2-202. However, that code section applies only to transactions covered by the Uniform Commercial Code. The lease and sale of land is not covered by the Uniform Commercial Code. See Va. Code § 8.2-106.

Where it is apparent from the face of the document that the writing is incomplete, evidence will be heard only as to additional terms "not inconsistent with or contrary to the writing." *Durham*, 205 Va. 441; 138 S.E.2d 55. The parol evidence must relate to terms "independent of and in addition to the written terms so that no merger has taken place." *Id.*

The parol evidence rule applies only where the language of the integrated written instrument is clear and unambiguous. Friend, § 20-5. If any term of the main written agreement is ambiguous, evidence of prior agreements is admissible to clarify that portion of the main instrument. Friend, § 20-5, *citing Cascades North Venture, Ltd. Partnership v. PRC, Inc.*, 249 Va. 574, 457 S.E.2d 370 (1995). The Supreme Court has stated that "[a]n ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time. *Amos v. Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984). The document is not ambiguous just because the parties disagree as to the meaning of the language used by them in the document. *Id.* Even though unartfully drawn, the court must construe the language of an agreement as written if its parts can be read together without conflict. *Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). Accordingly, parol evidence may be introduced where the agreement is susceptible of more than one interpretation, or an ambiguity exists, or the extent and object of the contract cannot be ascertained from the language employed. *Young v. Schriner*, 190 Va. 374, 379, 57 S.E.2d 33, 35 (1950). If the intention of the parties is clearly expressed in the instrument itself, parol evidence is not admissible to explain or vary its terms. Friend, § 20-5 *citing Cushman Va. Corp. v. Barnes*, 204 Va. 245, 251, 129 S.E.2d 633, 638 (1963). But where the intent of the parties is left ambiguous, parol evidence is admissible. This determination of ambiguity presents a question of law for the court, while the construction of a contract determined to be ambiguous is a question submitted to the trier of fact. *Westmoreland-LG & E·Partners v. Virginia Elec. & Power Co.*, 254 Va. 1, 486 S.E.2d 289 (1997). In making this determination, the court gives the language of the contract its plain meaning. *Amos*, 228 Va. at 92, 320 S.E.2d at 337.

Applying the foregoing principles, we look to the language of the contract itself to determine whether such language is ambiguous. Paragraph thirty-three, when read alone, indicates the manner in which the property will be taken by the lessee (Ison) if he purchases such property. It does not explicitly give Ison the *right* to purchase the property, only providing that *if* a purchase takes place, such purchase is "AS IS." Therefore, it is difficult to say that the language is ambiguous, but (as noted above) it is not difficult to see

that the language appears superfluous and unartfully drawn if it is to mean more than said.

Parol evidence cannot be considered to explain a patent ambiguity, that is, to supply the understanding that the parties could have reasonably been expected to reach where the language of the instrument reflects no understanding. Parol evidence may only be used to clarify a latent ambiguity – a term which, upon application to external objects, is found to fit two or more of them equally. *Zehler v. Bruce*, 208 Va. 796, 799, 160 S.E.2d 786, 799 (1968). In other words, the court will not write in contract terms for the parties, but it will attempt to determine the intent of the parties by interpreting terms susceptible of more than one meaning. Friend, § 20-5. The language of the paragraph simply reflects no understanding as to whether Ison had an option or right to purchase the property. It does reflect an understanding as to the absence of warranties *if* Ison purchases the property. However, a fair reading of the language in paragraph 33 does not reveal language clearly susceptible of more than one meaning. Accordingly, at most, there is only a patent ambiguity. There is no latent ambiguity and parol evidence is not admissible under the partial integration doctrine. That is not the end of the inquiry however.

### b. *Collateral Contract Doctrine*

Supplementing the Virginia parol evidence rule's partial integration doctrine is the "collateral contract doctrine." Friend, § 20-3; *see* Farnsworth, § 7.3 above (referring to this as the "collateral agreement" rule). Under that doctrine, parol evidence does not exclude parol proof of a prior or contemporaneous oral agreement that is independent of, collateral to, and not inconsistent with the written contract and which would not ordinarily be expected to be embodied in the writing. *High Knob*, 205 Va. at 506-07, 138 S.E.2d at 51. This doctrine is applicable in Virginia even though the face of the main instrument does not clearly reveal that terms are missing (as with the partial integration doctrine) since, by definition, the doctrine is applicable only to collateral matters which would not normally be contained in the main instrument. Friend, § 20-3.

The facts in this case are similar to the facts in *Ohio Machinery Co. v. Gbur*, 1979 Ohio App. LEXIS 8763 (1979) (unpublished disposition), a decision from a state like Virginia that leans toward the Williston approach by determining finality and completeness from the face of the document alone. Posner, *supra*, note 8 (citing *Trinova Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271, 275, 638 N.E.2d 572, 575 (1994)). In *Gbur*, the parties

entered into a written rental/purchase agreement after the seller told the buyer that he did not have the particular model of earth mover that the buyer wanted. The buyer agreed to rent a similar earth mover for four months with the understanding that he had the option to purchase the earth mover he actually wanted at the end of the four months, with the paid rent to apply to the purchase price. At the end of the four months, the buyer was told there were no models available of the earth mover he wanted. The buyer stopped making his rental payments and the seller sued for damages. The *Trinova* court observed that the buyer sought to "introduce oral testimony that it was his belief that he would rent the [similar] model with the option at the end of four months of purchasing the [desired model], and that a portion of the rental price would be credited toward the purchase of the desired model. *Gbur*, 1979 Ohio App. LEXIS 8763, ** 2-5. The portion of the contract dealing with the rental/purchase agreement stated: "All rentals paid to apply except $310.00 per month carrying charge if converted to a purchase you may deduct 5% from payoff balance." After admitting parol evidence to determine whether the credit was toward the purchase of the similar model or the desired model, the court concluded that the seller breached his promise to sell the desired model. Applying the Ohio version of the collateral contract doctrine,[7] the Court of Appeals of Ohio noted that the oral "collateral contract as to the [desired model] does not conflict with the written contract and does cover a subject matter distinct from, though closely related to, the express subject matter of the written contract." *Id.*

While the language of paragraph thirty-three of the lease agreement in this case is awkward in its treatment of the issue of a purchase, evidence regarding this lack of completeness is probably better seen as evidence of a collateral agreement (rather than a partial integration) since one would not expect the terms of a development arrangement to be included in a lease and since it is doubtful that it can be said the language "clearly" reflects missing terms (as necessary under the Virginia partial integration doctrine). *Jim Carpenter Co. v. Potts*, 225 Va. 147, 156, 495 S.E.2d 828, 833 (1998) (noting silence as to terms of agreement referenced in main contract requires

---

[7] The Ohio collateral contract doctrine provided that "[e]vidence of a collateral oral contract may be admissible in evidence along with a written contract, so long as such collateral contract does not conflict with the written contract, and when such collateral oral contract covers a subject matter, distinct from, though closely related to, the express subject matter of the written contract, and not embodied in the written contract." The Ohio collateral contract doctrine is, therefore, the same as the Virginia doctrine. *Gbur*, 1979 Ohio App. LEXIS 8763, *5.

invocation of collateral contract doctrine to supply missing terms or collateral agreement).[8]

Furthermore, the oral agreement alleged is not inconsistent with the written contract, as required for application of the collateral contract doctrine. As in *Gbur*, the language of the collateral contract alleged here is "distinct from, though closely related to, the express subject matter of the written contract." *Gbur*, 1979 Ohio App. LEXIS 8763, *5. The collateral contract in the *Gbur* case and this case involves an alleged option to purchase, and the written contract in both cases involved the rental of the item sought to be purchased, or its substitute. Accordingly, pursuant to Virginia's collateral contract doctrine of the parol evidence rule, the Court will consider the testimony and evidence regarding the orally modified Development Agreement as of the time that the lease agreement was signed on November 1, 2001.

## F. *Collateral Contract*

### 1. *Was there a contract?*

Having determined that the Court should consider parol evidence pursuant to the collateral contract doctrine, in deciding whether Ison had the right to purchase the property, the next question is whether such parol evidence proves the existence of a contract to purchase.

The essential elements of a contract are offer and acceptance, with valuable consideration. *See Montagna*, 221 Va. at 346, 269 S.E.2d at 844 (1980); *see* Stoebuck & Whittman, *The Law of Property*, § 10.1 (3d ed. West 2000). The proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690 (1990), *rev'd on other grounds*, 263 Va. 20, 23, 556 S.E.2d 767, 768 (2002).

When looking to the orally modified Development Agreement in existence on November 1, 2001, it is not difficult to see that Ison and PRHA

---

[8] While one might argue that the terms of the purchase option (rather than the Development Agreement) *would* normally be embodied in the lease and that therefore the parol evidence should be viewed under the partial integration doctrine (not the collateral contract doctrine), the effect is the same since the Court still looks to parol evidence. However, as Professor Farnsworth notes, where there is a merger clause (in this case, a clause requiring that all changes be in writing has a similar effect), it is difficult to argue for a partial integration.

had contracted for Ison to purchase the property. PRHA originally agreed to sell Ison the property for $50,000.00 and hold the deed as security for completion of the improvements within nine months of such purchase. As of November 1, 2001, PRHA and Ison had orally agreed to modify the Development Agreement such that Ison could purchase the property for $50,000.00 *after* completion of the agreed-upon improvements. They had also agreed to waive the original requirement for Ison to provide PRHA with a letter of credit/instrument of guaranty, such protection no longer being necessary with closing taking place *after* improvements were completed.[9] The Court also notes that there having been no evidence at this trial as to whether the orally amended Development Agreement contained the damages limitation of the original paragraph 6(b), thus leaving open the question of whether Ison is free to seek recovery for improvements he made to the property, the Court makes no finding as to the terms of the orally modified Development Agreement on this point. The evidence reveals that there was a collateral agreement in place on November 1, 2001, for Ison to purchase the property. However, the collateral agreement did not contain a specific time for performance. We must therefore address the absence of this term of the contract in order to determine whether Ison breached the contract so that PRHA could terminate such contract.

The evidence shows that, at the time the November 2001 lease agreement was signed, PRHA and Ison had agreed to extend the closing date contained in the January 2000 Development Agreement until improvements to the property were finished. As of November 1, 2001, when the lease agreement was signed, Wheatley and Ison had also agreed to extend the deadline for closing beyond the previously-proposed April 12, 2001, date, but the agreement to extend the closing date did not contain a specific time for closing. However, the letters from PRHA to Ison and the course of dealing reflect that time was very important to PRHA and they were not satisfied with Ison's failure to have the improvements completed as of November 1, 2001. "Settled contract law implies a reasonable time limitation for performance of conditions in contracts for the sale of land where no time for performance is fixed by the contract itself." *The Ryland Group, Inc. v. P. Reed Wills, Trustee,*

---

[9] The parol evidence rule does not prohibit introduction of evidence of oral or written agreements made *subsequent* to the execution of a written agreement. *Piedmont Co. v. Buchanan,* 146 Va. 617, 626, 131 S.E. 793, 795 (1926). Therefore, the Court is free to examine evidence outside the four corners of the Development Agreement to determine whether there was an oral agreement amending and/or superseding the original Development Agreement.

229 Va. 459, 465, 331 S.E.2d 399, 403 (1985); *F. L. Hall, Inc. v. Warehouse Landing Assocs.*, 38 Va. Cir. 181, 183 (Northumberland 1995). In the context of commercial leases, courts generally construe contracts to impose a requirement that conditions be performed within a reasonable time. *The Ryland Group*, 229 Va. at 465, 331 S.E.2d at 403. Therefore, the parol evidence shows PRHA and Ison had a contract in force on November 1, 2001, and that contract required Ison to complete the improvements within a reasonable time. The Court must now determine whether Ison breached the contract such that PRHA could terminate the agreement and obtain possession of the property.

### 2. Did Ison breach the contract?

As the Court noted in *Norfolk & Western Ry. v. Duke & Rudacille*, 107 Va. 764, 768, 60 S.E. 96, 98 (1908), where no time is specified, "what is a reasonable time is to be ascertained, in such cases, by placing the court and jury in the same situation as the contracting parties were when the contract was entered into." While Ison has alleged that he had an option to purchase the property under the lease agreement or pursuant to the orally modified Development Agreement, he really had a contract for the purchase of the property. Nonetheless, in defining a reasonable time, it is still helpful to look to the case law for determining reasonable time in the context of an option contract:

> In determining what is a reasonable time for exercise of an option, " 'the circumstances to be considered have a wide range: they include the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade. In general, the question is what time would be thought satisfactory to the offeree or by a reasonable man in the position of the offeree. . . .' Restatement of the Law, Second, Contracts, section 41, b."

*F. L. Hall, Inc.*, 38 Va. Cir. at 183. Furthermore, it has been said that " '[t]he more significant the risk, the greater is the need for limitation, and hence the shorter is the time which is reasonable. . . . A reasonable time for acceptance in a speculative transaction is brief not only because the offeror does not intend to assume an extended risk without compensation but also because he does not intend to give the offeror an extended opportunity for speculation at

the offeror's expense.' Restatement of the Law, Second, Contracts, section 41, f." *Id.*

Applying these principles to the facts of this case, the Court observes that the nature of the proposed contract option is speculative; that the parties clearly intended for the original closing date on the property and time for completion of improvements to take place before the end of 2000 and this is relevant to the course of dealing; that the parties agreed to extend the date of closing until after improvements were completed based on Ison's financial difficulties and inability to timely close and complete agreed-upon improvements, but such extension was not open-ended as demonstrated by PRHA's repeated inquiries to Ison and the course of dealing; that PRHA attempted to work with Ison by offering him extensions and seeking written confirmation of such extensions from him; that a reasonable man in the position of Ison would have thought November 1, 2001, through March 6, 2003, a reasonable and satisfactory time to PRHA for completion of the items necessary for closing on the property; and, that the time from November 1, 2001, through March 6, 2003, provided Ison with an extended opportunity for speculation at PRHA's expense and it exposed PRHA to an extended risk (of allowing the property to be leased for $1 per month and possibly missing other redevelopment opportunities for the highest and best use of the property) without compensation. For all these reasons, the Court concludes that Ison breached the contract with PRHA by failing to conclude the improvements and seeking to close on the property within a reasonable time.

The Court is not without sympathy for the situation that Ison described at trial, including the lawsuit in West Virginia and the difficulties in completing improvements. However, PRHA appears to have worked patiently with Ison for more than a reasonable period of time. "Courts, even in equity, must respect lawful contracts made by competent parties, and sympathy is not a ground for relief." *McClellan v. Ashley*, 200 Va. 38, 42-43, 104 S.E.2d 55, 58 (1958). In a situation such as this, where PRHA did not cause Ison's difficulties,[10] it is not for the Court to rewrite the contract for the benefit of one party. Otherwise, the level playing field of contract law would be obliterated because courts could freely rewrite contracts to benefit one party, after-the-fact, without any fault attributable to the other party.

---

[10] The difficulties experienced by Ison in having his improvements approved by PRHA have not been shown to be a frustration of the contract, but merely part of the process of working toward closing.

### G. *PRHA's Repudiation of Contract*

We now turn our attention to the effect of Ison's breach of the contract. If a "breaching party's performance is a constructive condition to the aggrieved party's duty of performance the latter may . . . treat the material breach as a failure of condition. In other words, he has the power to cancel the contract." John D. Calamari and Joseph M. Perillo, *Contracts*, § 11-22 (2d ed. 1977). The Court has examined the intentions of the parties and found that time was of the essence in the contract between PRHA and Ison. However, even if the Court had determined that time was not of the essence, a party may not delay performance indefinitely. Unreasonable delay constitutes a material breach of any contract, whether time is an essential element or not. *Howell v. Berne*, 24 Va. Cir. 484, 489 (Charlottesville 1991) (citing *Williston on Contract*, § 575 (3d ed. 1961)).

The evidence is clear that, pursuant to the orally amended Development Agreement, PRHA was prepared to sell the property to Ison upon his completion of the improvements. Ison's completion of the improvements and tender of the purchase price were conditions precedent to PRHA's obligation to close on the property. Calamari and Perillo, § 11-3. Ison failed to complete the improvements within a reasonable time and, consistent with settled principles of contract law, PRHA was free to cancel the contract, as it did by letter of March 6, 2003.

### III. *Conclusions*

PRHA had the authority to terminate the lease agreement and the right to cancel the collateral orally amended Development Agreement. Therefore, PRHA is entitled to possession of the property unless it decides to continue its development and/or lease arrangement with Ison. Judgment for possession is granted to PRHA. The objections to this Opinion and Order, as stated and argued in the pleadings, this Opinion and Order, and that portion of the proceedings recorded by a court reporter, are preserved and exceptions are noted on such basis. The Court therefore dispenses with the Rule 1:13 counsel endorsement requirement. It is so ordered.